THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JACOB RAMOS, Defendant-Appellant.

First District (4th Division)     No. 1—03—2963

Opinion filed September 30, 2004.

THEIS, J., specially concurring.

QUINN, J., specially concurring.

Michael J. Pelletier and Brett C. Zeeb, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Sally Dilgart, John E. Nowak, and Paul A. Ruscheinski, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

After a bench trial, defendant Jacob Ramos was convicted of residential burglary and was sentenced to 16 years in prison. Defendant now appeals, arguing that his sentence was excessive, that he received a disproportionately long sentence as compared to a similarly situated codefendant, and that the compulsory extraction and perpetual storing of his DNA violated his fourth amendment right to be free from unreasonable searches and seizures. For the reasons that follow, we affirm the defendant's conviction and sentence as well as the constitutionality of section 5—4—3(a)(3.5) of the Unified Code of Corrections (730 ILCS 5/5—4—3 (West 2002)).

On June 21, 2002, Chicago police officer Del Rivero and his partner, Officer Haran, were assigned to investigate numerous burglaries that had occurred near Damen Street and Wood Street in Chicago, Illinois. That day, Officer Del Rivero conducted surveillance on the street while Officer Haran was in an unmarked car a few blocks away. At approximately 2:50 p.m., Officer Del Rivero noticed the defendant acting suspiciously in front of a residence at 902 Winchester Street. Apparently, the defendant was looking in all directions, up and down, when the codefendant walked out of a gangway between the buildings at 900 and 902 Winchester. Defendant and Gonzalez had a short conversation and then proceeded to ring the doorbells of the units in 902 and 904 Winchester.

At that point, Officer Del Rivero noticed the defendant and codefendant walk to the rear of 902 Winchester. Gonzalez then appeared in the gangway with a toolbox in his hand, and he placed it on its side below a windowsill of the 902 Winchester building. Using the toolbox as a stair, Gonzalez balanced himself on the windowsill, and defendant boosted Gonzalez up toward the windowsill. Gonzalez then forced the window open with his hands and entered the first-floor apartment.

From nearly 60 feet away, Officer Del Rivero then watched the defendant walk to the front door of the first floor of 902 Winchester and proceed through the door, which Gonzalez had opened from the inside. After two to three minutes in the apartment, the defendant and Gonzalez exited the building and walked north on Winchester. Defendant was holding an Aldi shopping bag. At that point, Officer Del Rivero contacted another enforcement officer and gave him a description of the defendant and Gonzalez. After the enforcement officer and Officer Haran stopped and detained the defendant and Gonzalez, they searched the Aldi bag and retrieved several items, including two white vases.

After the victim had returned home, he verified to police that his apartment was not in the same order as he had left it that morning.

He also verified that several items were missing and was later able to confirm that the items recovered from the Aldi bag were taken from his apartment. Some of the items, however, were never recovered. The victim had never met the defendant or Gonzalez and did not grant them permission to enter his apartment.

In light of the evidence, the trial court found the defendant guilty of residential burglary and sentenced him to 16 years in prison. At the time of the sentencing, the State asked the court to order defendant to produce a blood sample for forensic DNA testing. Defendant did not object, and on May 20, 2003, the court granted the State's motion. The defendant now appeals his sentence and the order to produce.

Defendant's first argument on appeal is that his sentence of 16 years for residential burglary is excessive in light of his personal history, the particular circumstances of the offense, and his strong rehabilitative potential. We note that Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)) grants a reviewing court the authority to reduce a sentence imposed by the trial court if the reviewing court finds that the trial court abused its discretion in imposing the sentence. *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977).

The defendant was sentenced as a Class X offender pursuant to section 5—5—3(c)(8) of the Unified Code of Corrections (730 ILCS 5/5—5—3(c)(8) (West 2002)), which states, in pertinent part:

"When a defendant, over the age of 21 years, is convicted of a Class 1 or Class 2 felony, after having twice been convicted in any state or federal court of an offense that contains the same elements as an offense now classified in Illinois as a Class 2 or greater Class felony and such charges are separately brought and tried and arise out of different series of acts, such defendant shall be sentenced as a Class X offender." 730 ILCS 5/5—5—3(c)(8) (West 2002).

Any defendant convicted of a Class X felony faces a sentence of a minimum of 6 years' to a maximum of 30 years' imprisonment. 730 ILCS 5/5—8—1(a)(3) (West 2002). Here, because the defendant had eight prior felony convictions, the trial court was required to sentence him as a Class X offender. Nevertheless, defendant argues that the trial court erred in failing to consider several factors in mitigation.

First, defendant argues that because he neither caused nor contemplated that his action would cause bodily harm during the time of the offense, the trial court should have provided a reduced sentence. For this, he notes that the offense occurred at approximately three in the afternoon after he and his codefendant first rang the apartment's doorbell to ensure nobody was present. He also notes that when he was captured, neither he nor his codefendant was armed nor did they attempt to flee or resist arrest. In that vein, he also notes that none of his prior convictions were violent or drug-related.

Next, he argues that the trial court failed to take into account his background. In support of that argument, defendant alleges that his extended imprisonment would entail a hardship on his dependents, since, prior to the arrest, he was earning $14.42 per hour plus commission as a salesman. In addition, he claims that he was soon to have been promoted to the position of warehouse manager by his employer, Mr. Cheeks, who would hire him upon release from prison. He also notes that his incarceration could endanger his medical condition, as he is HIV positive.

Third, defendant claims that the trial court failed to consider his strong rehabilitative potential, in that he has earned his GED, completed 117 college credits at various junior colleges through the Department of Corrections, obtained a certificate of culinary arts, and is two credits short of earning an associate's degree in digital electronics. In addition to his education, the defendant states, he worked at El Meson, a rehabilitative facility for alcohol and drug abusers. There, defendant notes, he taught Bible study and was instrumental in saving a program that helps ex-offenders find jobs, secure housing, and get an education.

Looking at the totality of this mitigating evidence, defendant then draws attention to this court's decision in *People v. Center*, 198 Ill. App. 3d 1025 (1990). There, the defendant was convicted of burglarizing a laundromat. At sentencing, the State presented the defendant's criminal record, which contained two prior Class 2 felony convictions, one for robbery and one for burglary. *Center*, 198 Ill. App. 3d at 1033. The trial court reviewed the defendant's personal history and found him eligible for a Class X sentence under the statute now codified as section 5—5—3(c)(8) of the Unified Code of Corrections, and sentenced the defendant to 15 years. *Center*, 198 Ill. App. 3d at 1034. After reviewing the defendant's personal history, this court found no aggravating factors other than the two previous convictions and thus concluded that the defendant possessed the capability and potential for rehabilitation. *Center*, 198 Ill. App. 3d at 1035. Consequently, the court found the 15-year sentence to be excessive and reduced the sentence to 7 years. *Center*, 198 Ill. App. 3d at 1035.

Likewise, in the present case, defendant argues that the only aggravating factor is his prior criminal history and that he possesses a "substantial amount of mitigating factors." Defendant concludes that where his prior adult record contains only nonviolent offenses and where he has taken affirmative steps with his education and his career and where he has served as a positive influence upon other ex-offenders and addicts, his 16-year sentence does not conform with the spirit or purpose of the law. We disagree.

In determining a sentence, a trial court must analyze the acts constituting the crime and a defendant's credibility, demeanor, general moral character, mentality, social environments, habits, age, and potential for rehabilitation. *People v. Steffens*, 131 Ill. App. 3d 141, 152-53 (1985). However, because the trial court is in a better position to judge the credibility of the witnesses and the weight of the evidence at the sentencing hearing, its decision is entitled to great deference and will not be overturned even if we may have balanced the factors differently. *People v. Jones*, 168 Ill. 2d 367, 373 (1995); *People v. Beals*, 162 Ill. 2d 497, 511 (1994); *People v. Cox*, 82 Ill. 2d 268, 280 (1980). In other words, we will not find an abuse of the trial court's discretion unless its decision is fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it. *People v. Ortega*, 209 Ill. 2d 354, 359 (2004). In addition, whenever a sentence falls within the statutorily mandated guidelines, we presume it to be proper and will not overturn it unless there is an affirmative showing that the sentence varies greatly from the purpose and the spirit of the law, or is manifestly disproportionate to the nature of the offense. *People v. Fern*, 189 Ill. 2d 48, 54 (1999). Finally, it is well settled that a trial court is presumed to have considered all the mitigating factors in front of it. *People v. Burnette*, 325 Ill. App. 3d 792, 808 (2001).

As previously mentioned, the defendant here was required to be sentenced as a Class X offender because he was over 21 years old, the conviction in this case was a Class 1 felony, and the defendant had been convicted of at least two prior Class 2 felonies. 730 ILCS 5/5—5—3(c)(8) (West 2002). We note that where the sentencing range for a Class X offender is between 6 and 30 years (730 ILCS 5/5—8—1(a)(3) (West 2002)), defendant's sentence of 16 years was well within the statutory range.

In that regard, we find it irrelevant that the circumstances of this offense or any of his previous offenses were nonviolent and non-drug-related. Indeed, section 5—5—3(a)(8) of the Unified Code of Corrections does not require that any offense be violent or drug-related in nature. 730 ILCS 5/5—5—3(a)(8) (West 2002). In any event, we are to presume the trial court considered those details in making its final calculation of the defendant's sentence. *Burnette*, 325 Ill. App. 3d at 808. Accordingly, we think that the trial court acted well within its discretion in imposing a sentence in the middle of the statutory range, where the defendant not only met the prior felony requirements of section 5—5—3(a)(8), but exceeded them by eight felony convictions.

In addressing whether the trial court erred in failing to consider the defendant's background in imposing his sentence, we note that it is well established that a trial court "need not articulate the process

by which it determines the appropriateness of a given sentence." *People v. Wright*, 272 Ill. App. 3d 1033, 1045-46 (1995). Put another way, "[t]he trial [court] is not required 'to detail for the record the process by which [it] concluded that the penalty [it] imposed was appropriate.' " *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992), quoting *People v. La Pointe*, 88 Ill. 2d 482, 493 (1981). Thus, it is of no moment in the present case that the trial court failed to articulate its consideration of mitigating facts. See *People v. Wright*, 272 Ill. App. 3d 1033, 1046 (1995). And because we must presume that the trial court considered all the mitigating factors before it (*Burnette*, 325 Ill. App. 3d at 808), absent a contrary indication other than the sentence (*People v. Cagle*, 277 Ill. App. 3d 29, 32 (1996)), the defendant's argument must fail. In fact, we note that the record reveals that all of this information was, in fact, in the presentence report that was before the court for its consideration. It appears the trial court simply found that a lighter sentence was not warranted based on the recidivistic nature of the defendant's crimes. Therefore, because there is no evidence to suggest that the trial court ignored any one of defendant's mitigating factors—other than its failure to individually list all of them while imposing its sentence—we cannot find an abuse of discretion.

As to the trial court's alleged disregard for defendant's rehabilitative potential, we note that seven of the defendant's eight prior convictions involved a burglary, robbery, or a theft. As the State points out, in 1989 alone, the defendant was convicted of residential burglary three times. Clearly, where a defendant's potential for rehabilitation can be gleaned in part by his criminal history (*People v. Coleman*, 201 Ill. App. 3d 803, 809 (1990)), the defendant's repeated commission of these types of crimes suggests that he has almost no likelihood of ever rehabilitating himself. See *People v. Knight*, 139 Ill. App. 3d 188, 197 (1985) (held that the more extensive a defendant's criminal record, the lower the potential for rehabilitation). This conclusion is even more apparent when considering the amount of support the defendant received throughout his life, as indicated by the trial court. Where it is indisputable that the defendant repeatedly has chosen a life of crime over making good use of that overwhelming support, it certainly is reasonable to conclude that he would mimic such behavior in the future. Thus, defendant's argument fails in this regard as well.

Defendant's reliance on *Center* fares no better. The comparative sentence approach has been denounced roundly as fundamentally flawed in *People v. Fern*, 189 Ill. 2d 48, 55 (1999), and *People v. Bien*, 277 Ill. App. 3d 744, 753 (1996). This court reasoned that the comparative sentence approach "also frustrates the purposes of individually tailored sentences as it fails to consider the nuances unique to each

case." *Bien*, 277 Ill. App. 3d at 754. Indeed, as the State notes, the supreme court has found the comparisons between two defendants to be proper only when their circumstances are substantially identical. *People v. Leger*, 149 Ill. 2d 355, 411 (1992).

In this case, the only similarity between the defendant and the defendant in *Center* is the nonviolent nature of their crimes. In *Center*, the defendant was 23 years old, he burglarized a closed laundromat, he acted only as lookout, there were no proceeds, and he had only two prior convictions. Here, the defendant was 42 years old, he burglarized a home rather than a business, he actively entered the home while committing the crime, and he had eight prior felony convictions as opposed to two. Thus, as the circumstances surrounding the defendant in *Center* and the defendant in the present case are actually very dissimilar, defendant's reliance upon the comparative sentence approach (by way of *Center*) also fails.

Defendant next argues that his 16-year sentence should be reduced because it is unsuitably disparate compared to the 7-year sentence received by his codefendant, Gonzalez. Fundamental fairness and respect for the law require that defendants who are similarly situated should not receive grossly disparate sentences. *Fern*, 189 Ill. 2d at 58; *People v. Thornton*, 286 Ill. App. 3d 624, 636 (1997). Moreover, improper sentence disparity occurs when equally culpable defendants with similar backgrounds are given substantially different sentences or when equally culpable defendants with different backgrounds, ages, and criminal propensities are given the same sentence. *People v. Smith*, 214 Ill. App. 3d 327, 342 (1991). Accordingly, to prevail on a claim of disparate sentencing, a defendant must demonstrate that he and his codefendant were similarly situated with respect to background, prior criminal history, and potential for rehabilitation. *People v. Curry*, 296 Ill. App. 3d 559, 569 (1998), citing *People v. Cooper*, 239 Ill. App. 3d 336, 363 (1992). In the present case, defendant argues that none of these factors warrant the trial court sentencing the defendant to more than twice as many years in prison than Gonzalez.

For example, defendant notes that both he and Gonzalez have extensive criminal backgrounds. Gonzalez's prior adult convictions include robbery, aggravated battery, and possession of a controlled substance. These offenses were committed in 2001, for which he received 30 months' probation. In 1998, Gonzalez was convicted of domestic battery, and the one-year conditional discharge he received for that offense was revoked. Further, in 1994, Gonzalez was convicted of another charge of possession of a controlled substance and received probation. He later violated that probation and was sentenced to 42 days' imprisonment.

Defendant acknowledges that he also has several prior convictions: a 1979 burglary conviction, a 1979 robbery conviction, a 1985 residential burglary conviction, three 1989 burglary convictions, a 1996 retail theft conviction, and a 1996 possession-of-a-controlled-substance-with-intent-to-deliver conviction. However, while he concedes that his criminal history is more extensive than Gonzalez's, he notes that he was never convicted of a violent offense, such as domestic battery. Accordingly, he concludes that even if his criminal history justifies a longer sentence, it cannot account for the gross disparity between the sentences.

Defendant also argues that he has demonstrated a much stronger potential for rehabilitation than Gonzalez. For example, where defendant has shown that he has taken affirmative steps with his education and his career (such as the 117 college credits at various colleges, that he is 2 credits away from receiving an associate's degree in digital electronics, and that he has secured a job at Mr. Cheeks's warehouse upon release) and has served as a positive influence upon other ex-offenders and addicts (such as teaching Bible study and saving a program that helps ex-offenders find jobs), the only mitigating evidence that Gonzalez provided was that he was a drug addict. In fact, defendant notes, Gonzalez, a high school graduate, provided no evidence that he had made any contribution to society or has secured any definite employment upon release from prison.

Finally, defendant argues that there was no evidence that he was the principal offender or played a greater role in the offense than Gonzalez to justify a disparate sentence. Rather, defendant notes that the evidence presented at trial shows that both defendants participated equally in the offense, as both helped each other enter the building and participated in the burglary. And because, defendant asserts, both offenders were equally culpable, a disparate sentence was not warranted.

As noted above, a trial court's judgment as to an appropriate offense is entitled to great deference and will not be altered on review absent a showing that the punishment imposed constitutes a clear abuse of discretion. *Beals*, 162 Ill. 2d at 512. Accordingly, we may not change the trial court's decision unless we determine that no reasonable finder of fact would agree with it. *Ortega*, 209 Ill. 2d at 359.

■ In reviewing the respective defendant's criminal background, the only similarity we discern is that both individuals had prior convictions. However, it is undisputed that the defendant's record includes convictions for eight prior felonies and four misdemeanors, whereas the codefendant's includes four felony convictions and one misdemeanor. And while it is true that the defendant was involved in activi-

ties which might normally be considered to be indicative of rehabilitative potential, the fact that he constantly eschewed those activities and support for criminal activity indicates that defendant had little potential for rehabilitation—much like the codefendant. Accordingly, we find it entirely reasonable for the trial court to have judged the circumstances surrounding each individual to be entirely dissimilar. Quite simply, the raw numbers reveal that the defendant was convicted of 12 crimes, where the codefendant was convicted of 5. Accordingly, in light of the fact that there is ample evidence to suggest that the codefendants are not similarly situated, we find that defendant has failed to satisfy a necessary requirement to reduce a disparate sentence under *Cooper*. Given the great deference with which we are to review the trial court's decision, we affirm the trial court's imposition of defendant's 16-year sentence.

■ Defendant's last argument challenges the trial court's grant of the State's motion to produce a DNA sample. Specifically, he asserts that section 5—4—3 of the Code of Corrections (730 ILCS 5/5—4—3 (West 2002)) is unconstitutional for violating his fourth amendment right to be free from unreasonable searches and seizures.[1] In pertinent part, section 5—4—3(a)(3.5) mandates:

> "Any person *** convicted or found guilty of any offense classified as a felony under Illinois law *** shall, regardless of the sentence or disposition imposed, be required to submit specimens of blood, saliva, or tissue to the Illinois Department of State Police in accordance with the provisions of this Section, provided such person is:

---

[1]In his appellate brief, defendant challenges the constitutionality of subsection (a—5) of section 5—4—3. In fact, the order in which the trial court requested a sample of the defendant's blood for DNA analysis was entered simply pursuant to section 5—4—3, but did not list any specific subsection therein. However, we find the language in subsection (a)(3.5) controls the facts at issue here, where subsection (a)(3.5) mandatorily charges the trial court with the duty to order all convicted felons to provide a blood sample for DNA testing. Conversely, subsection (a—5) only permissively grants discretion to the trial court to determine whether to order a defendant to provide such a sample. Accordingly, subsection (a—5) could only be utilized—if at all—to the total exclusion of every other mandatory subsection listed under section 5—4—3(a), including section 5—4—3(a)(3.5). 730 ILCS 5/5—4—3(a)(a—5), (a)(3.5) (West 2002). Therefore, because the defendant in the case at bar is a convicted felon, and because the trial court was required to order the defendant to provide a blood sample under subsection (a)(3.5), we limit our review today to the constitutionality of section 5—4—3(a)(3.5). 730 ILCS 5/5—4—3(a)(3.5) (West 2002).

* * *

(3.5) [C]onvicted or found guilty of any offense classified as a felony under Illinois law or found guilty or given supervision for such an offense under the Juvenile Court Act of 1987 on or after [August 22, 2002.]" 730 ILCS 5/5—4—3(a)(3.5) (West 2002).

The fourth amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ***." U.S. Const., amend. IV. As the defendant notes, the United States Supreme Court has held repeatedly that blood extractions are searches for the purposes of the fourth amendment and, therefore, are subject to the normal fourth amendment requirements. See *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 616, 103 L. Ed. 2d 639, 659, 109 S. Ct. 1402, 1412-13 (1989).

Defendant correctly notes that because a constitutional challenge to a criminal statute may be raised at any time, he has not waived review of this issue despite his raising it for the first time on appeal. *People v. Bryant*, 128 Ill. 2d 448, 454 (1989). Whether a statute is constitutional is a question of law subject to *de novo* review. *People v. Fisher*, 184 Ill. 2d 441, 448 (1998).

Defendant's challenge to section 5—4—3(a)(3.5)'s constitutionality is twofold. Initially, he notes that the United States Supreme Court has clarified that the fourth amendment prohibits nonconsensual, warrantless and suspicionless searches into a person's body or home unless the purpose of the search serves a "special need" beyond general law enforcement. See *City of Indianapolis v. Edmond*, 531 U.S. 32, 41, 148 L. Ed. 2d 333, 343, 121 S. Ct. 447, 454 (2000); *Ferguson v. City of Charleston*, 532 U.S. 67, 84, 149 L. Ed. 2d 205, 220, 121 S. Ct. 1281, 1292 (2001). In particular, defendant notes, the Court has recognized this "special need" exception to suspicionless searches only in limited circumstances, such as sobriety checkpoints that serve the "special need" of removing drunk drivers from the road. See *New York v. Burger*, 482 U.S. 691, 702, 96 L. Ed. 2d 601, 614, 107 S. Ct. 2636, 2644 (1987) (warrantless administrative inspection allowed because the search was appropriately limited); *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 450, 110 L. Ed. 2d 412, 420, 110 S. Ct. 2481, 2485 (1990) (sobriety checkpoints aimed at removing drunk drivers from the road were held permitted).

For example, defendant notes that in *Edmond*, in examining the constitutionality of a practice of the Indianapolis State Police to stop a predetermined number of vehicles at checkpoints, the Court emphasized that in "none of these cases, however, did we indicate approval

of a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." *Edmond*, 531 U.S. at 38, 148 L. Ed. 2d at 341, 121 S. Ct. at 452. In *Edmond*, the Court ultimately found that because the primary purpose of the Indianapolis checkpoint program was to uncover evidence of ordinary criminal wrongdoing, it violated the fourth amendment. *Edmond*, 531 U.S. at 48, 148 L. Ed. 2d at 347-48, 121 S. Ct. at 458. In other words, where there is a law enforcement purpose for a search that does not extend beyond the ordinary enterprise of investigating crimes, the Court ruled that it would not suspend the usual requirement of individualized suspicion. *Edmond*, 531 U.S. at 44, 148 L. Ed. 2d at 345, 121 S. Ct. at 455.

In light of these decisions, defendant asserts, the mandatory extraction of his blood, without individualized suspicion, violates the fourth amendment because the purpose of taking his blood was not for any "special need" beyond general law enforcement.

Alternatively, defendant argues that even if we reject the "special needs" approach in favor of balancing the degree to which the search intrudes on an individual's privacy interests against the degree to which the search is needed to promote legitimate government interests, the search here was not reasonable. By way of contrast, defendant notes the Second District's decision in *People v. Wealer*, 264 Ill. App. 3d 6, 16 (1994). Originally, the statute at issue in the present case applied only to sex offenders (see 730 ILCS 5/5—4—3 (West 1992)) and was only recently amended to encompass all felony offenders. The *Wealer* court, in addressing a challenge to the sex-offender version of the statute, utilized the balancing test and found that the State had a legitimate interest in deterring and prosecuting acts committed by sex offenders and that interest was "especially compelling when we consider that sex offenders frequently target children as their victims." *Wealer*, 264 Ill. App. 3d at 16. In addition, the *Wealer* court found that the State had a substantial interest in using DNA evidence to solve future sexual offenses and to establish the identity of convicted sex offenders and repeat offenders who attempt to conceal or alter their identity. *Wealer*, 264 Ill. App. 3d at 16.

However, defendant notes, in *Wealer*, the court emphasized that there was no risk that the DNA statute would be applied in an arbitrary or oppressive fashion because its application was uniformly applied to sex offenders. *Wealer*, 264 Ill. App. 3d at 15. Under the statute at issue here, however, defendant argues that DNA extraction is not applied to a narrow class of individuals. Rather, the DNA statute "may" be applied to any person convicted or found guilty of any offense classified as a felony under Illinois law. Consequently, because the trial court has the discretion to order any person convicted of a

felony to submit to DNA testing pursuant to section 5—4—3(a)(3.5), defendant argues that such discretion leads to the inherent risk of a trial court applying the DNA statute in an arbitrary or oppressive manner. And it is the very "arbitrary" or "broad" nature of the DNA statute which, defendant argues, should militate against finding it reasonable.

Furthermore, in analyzing the degree to which section 5—4—3(a)(3.5) advances the State's interests by taking blood samples of nonviolent property offenders—such as the defendant—without their consent, the defendant asserts that the interests asserted in *Wealer* do not apply because the defendant here is not a sex offender. In short, defendant claims, the State has no compelling interests regarding nonviolent nonsexual offenders (like himself) because our society does not consider those offenders to be as heinous as sex offenders. Moreover, in the context of sexual and violent crimes, he argues that a perpetrator is likely to leave DNA evidence on the scene or on the victim because those crimes involve bodily fluids such as semen or blood. Therefore, in those instances, there is a reasonable likelihood that a convicted sex offender's DNA sample may be used to solve future sex crimes. However, in the context of a nonviolent property offense, such as in the case at bar, defendant asserts that "there is virtually no chance that DNA evidence would be involved in the investigation or prosecution of similar cases in the future." Accordingly, because the likelihood of law enforcement using that person's DNA to solve future nonviolent property cases is extremely remote, defendant claims that the forced extraction of his DNA fails to reasonably advance the State's interests.

Finally, defendant argues that the degree of the intrusion of a DNA extraction upon his privacy rights is great, where it has been held that blood extraction for DNA genetic pattern analysis fundamentally differs from less intrusive searches as fingerprinting and therefore commands more constitutional protection. Blood extraction, defendant argues, requires penetrating a person's skin and withdrawing bodily fluid, while fingerprinting merely records physical attributes that are generally exposed to public view and "represents a much less serious intrusion upon personal security than other types of searches and detentions." *Hayes v. Florida*, 470 U.S. 811, 814, 84 L. Ed. 2d 705, 709, 105 S. Ct. 1643, 1646 (1985). And because such uniquely private genetic facts about an individual go well beyond the identifying mark of a fingerprint, he asserts, all individuals "clearly have an interest in avoiding disclosure of such personal information."

The defendant concedes that his status as a prisoner may "slightly" reduce his expectation of privacy, but he argues that

convicted prisoners do not forfeit their constitutional protections by reason of their conviction. *Bell v. Wolfish*, 441 U.S. 520, 545, 60 L. Ed. 2d 447, 472-73, 99 S. Ct. 1861, 1877 (1979); *Wealer*, 264 Ill. App. 3d at 17. In other words, defendant asserts that his status as a prisoner cannot justify the State's abandonment of the constitutional requirements for an intrusion into his bodily integrity. Ultimately, defendant concludes that where he has demonstrated that no legitimate needs are served by the forced extraction of blood from individuals such himself, and where he has a great privacy interest in the genetic information to be obtained from that blood, the constitutional balancing test also requires this court to strike down section 5—4—3(a)(3.5) as unconstitutional.

The Second District has already entertained and rejected the very same claims made by the defendant in *People v. Garvin*, 349 Ill. App. 3d 845 (2004).[2] In reaching its decision, the *Garvin* court noted that all 50 states and the District of Columbia have enacted genetic marker testing statutes. See *Garvin*, 349 Ill. App. 3d at 853-54. It also noted that these statutes have been challenged in courts of numerous jurisdictions, and all, to date, have been held to be constitutional. *Garvin*, 349 Ill. App. 3d at 854. See also *United States v. Kincade*, No. 02—50380 (9th Cir. August 18, 2004) (finding the extraction of a federal criminal's DNA, pursuant to the DNA Analysis Backlog Elimination Act of 2000 (42 U.S.C. §§ 14135a(c)(1) through (c)(2) (2000)), to be constitutional).

In making those determinations, the *Garvin* court observed, the foregoing courts have indeed taken two approaches in their fourth amendment analyses, those being the balancing test and the special needs test. *Garvin*, 349 Ill. App. 3d at 855. However, *Garvin* found that the Second District previously rejected the special needs approach in favor of the balancing approach (*Wealer*, 264 Ill. App. 3d at 12), and consequently followed the reasoning of the balancing approach in that case. *Garvin*, 349 Ill. App. 3d at 855. In that regard, in measuring the State's interest, the *Garvin* court found:

> "[I]t is beyond dispute that the State has a strong interest in deterring and prosecuting recidivist criminal acts. *In re Robert K.*, 336 Ill. App. 3d 867, 871 (2003); *Wealer*, 264 Ill. App. 3d at 17. Section 5—4—3 of the Code of Corrections is closely related to this interest. Mandatory DNA testing of convicted felons is a precise

---

[2]*Garvin*, we note, couched its holding in terms of finding *all* of section 5—4—3 to be constitutional, and did not focus upon or specify any particular subsection therein. We, however, wish to emphasize that our holding today does not cover any other section than section 5—4—3(a)(3.5).

technological method of identifying and eliminating potential suspects. *Robert K.*, 336 Ill. App. 3d at 871; *Wealer*, 264 Ill. App. 3d at 17. DNA identification has been likened to a fingerprint. See *Landry v. Attorney General*, 429 Mass. [336,] 346-47, 709 N.E.2d [1085,] 1092 [(1999)]. While some differences exist, they are both identity markers. DNA is more conclusive and 'can practically guarantee a 100% certain identity.' *Miller v. United States Parole Comm'n*, 259 F. Supp. 2d 1166, 1177-78 (D. Kan. 2003)." *Garvin*, 349 Ill. App. 3d at 855.

Thereafter, in analyzing the defendant's expectation of privacy, the *Garvin* court noted the oft-repeated principle that convicted persons, including those people on probation, lose some rights to personal privacy that would otherwise be protected under the fourth amendment. *Garvin*, 349 Ill. App. 3d at 855, citing *Griffin v. Wisconsin*, 483 U.S. 868, 880, 97 L. Ed. 2d 709, 722, 107 S. Ct. 3164, 3172 (1987); *Hudson v. Palmer*, 468 U.S. 517, 530, 82 L. Ed. 2d 393, 405, 104 S. Ct. 3194, 3202 (1984). *Garvin* also goes so far as to note that once a person becomes convicted of one of the felonies enumerated in a genetic marker testing statute, "his or her identity has become a matter of state interest and he or she has lost any legitimate expectation of privacy in the identifying information derived from the bodily sampling. [Citations.]" *Garvin*, 349 Ill. App. 3d at 855. Apparently, therefore, the *Garvin* court is of the opinion that the defendant in that case—and any other defendant who falls under section 5—4—3's requirements—retained no interest whatsoever in keeping such genetic information private.

Finally, the *Garvin* court also analyzed the relative intrusiveness of a blood extraction and noted that other courts considering fourth amendment challenges have "universally determined that a blood draw from a convicted person to gather genetic information for identification involves only a minimal intrusion. [Citation.]" *Garvin*, 349 Ill. App. 3d at 856. In fact, *Garvin* noted, the United States Supreme Court has found that a blood draw is not an " 'unduly extensive imposition' (*Winston v. Lee*, 470 U.S. 753, 762, 84 L. Ed. 2d 662, 670, 105 S. Ct. 1611, 1617 (1985)) and 'would not be considered offensive by even the most delicate' (*Breithaupt v. Abram*, 352 U.S. 432, 436, 1 L. Ed. 2d 448, 451, 77 S. Ct. 408, 410 (1957))." *Garvin*, 349 Ill. App. 3d at 856. Indeed, *Garvin* concludes, this court has previously determined that the physical intrusion imposed by the DNA testing mandated by section 5—4—3 " 'is relatively slight and poses no threat to the health or safety of the individual tested.' *Wealer*, 264 Ill. App. 3d at 16, citing *People v. Adams*, 149 Ill. 2d 331, 346 (1992)." *Garvin*, 349 Ill. App. 3d at 856.

In sum, therefore, the *Garvin* court found section 5—4—3 was not unconstitutional because: (1) the public has a significant interest in preventing recidivism and accurately determining guilt or innocence in such cases, where the identity of the person previously convicted of a crime is a state interest; (2) upon conviction of a felony, a defendant loses any realistic expectation of privacy in identifying information, such as DNA extraction, even if that information is used only for law enforcement and deterrent purposes (thereby nullifying the "special needs" test); and (3) the physical intrusion caused by such DNA tests is slight and nearly risk-free. Put another way, the court found simply that the State's interest in deterring and prosecuting recidivist criminal acts far outweighs a convict's diminished right to privacy and the minimal intrusion caused by the extraction.

Initially, we note that in determining whether to use the "special needs" test or the balancing test, the *Garvin* court simply deferred to its previous decision in *Wealer* and applied the balancing test without any further elaboration. Therefore, to better understand why the balancing test is the preferred approach in Illinois when considering the constitutionality of the genetic marker testing statute, we feel it necessary to examine the reasoning in *Wealer*.

At the outset, the *Wealer* court described the "special needs" test as an exception to the general rule that a search or seizure be conducted under the authority of a warrant. *Wealer*, 264 Ill. App. 3d at 11. The "special needs" exception "recognizes that the warrant and probable cause requirements are not always necessary to sustain the validity of a governmental intrusion challenged on fourth amendment grounds. [Citations.]" *Wealer*, 264 Ill. App. 3d at 11. As *Wealer* quoted the United States Supreme Court:

> " '[W]here a Fourth Amendment intrusion serves special governmental needs, *beyond the normal need for law enforcement,* it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context.' (Emphasis added.) *National Treasury Employees Union v. Von Raab* (1989), 489 U.S. 656, 665-66, 103 L. Ed. 2d 685, 702, 109 S. Ct. 1384, 1390-91." *Wealer*, 264 Ill. App. 3d at 11.

However, the *Wealer* court recognized that the overriding number of cases which employed the "special needs" test involved instances in which the court was able to identify an administrative justification independent of a law enforcement purpose. *Wealer*, 264 Ill. App. 3d at 12 (and cases cited therein). The *Wealer* court reasoned this was because the "special needs" test was rooted in the administrative search doctrine. *Wealer*, 264 Ill. App. 3d at 12.

Conversely, the *Wealer* court noted that the balancing test exception also "relies primarily on the perceived willingness of the United States Supreme Court, under certain circumstances, to relax or eliminate any requirement of probable cause or individualized suspicion where the nature of the intrusion occasioned by a particular search or seizure is minimal and the government's interest significant. [Citations.]" *Wealer*, 264 Ill. App. 3d at 14. Under that approach, *Wealer* noted, the courts are to balance the government's interest in carrying out the search, the extent to which the search promotes that interest, and the measure of intrusion upon a person's privacy to determine whether the search is reasonable. *Wealer*, 264 Ill. App. 3d at 14. In such instances, however, a court of review need not find a "special" need "beyond the normal needs of law enforcement."

In the end, the *Wealer* court opted for the balancing test, reasoning:

> "[I]n the absence of a clearly articulated administrative justification independent of a law enforcement purpose, we are reluctant to extend the special needs line of cases to the present statute, which has an ostensible law enforcement purpose. Furthermore, it does not require us to identify some 'special' or extranormal law enforcement need 'beyond the normal needs of law enforcement.' " *Wealer*, 264 Ill. App. 3d at 14.

In other words, the *Wealer* court recognized the possibility that, in some instances, the absence of a definitively defined justification for a search should not automatically render the search constitutionally invalid, such as where there exists a valid law enforcement purpose, the search somehow aids that purpose, and the search was not a sizeable imposition upon the privacy rights of the individual searched. In finding those three circumstances to exist in the facts before it, the *Wealer* court then applied the balancing test and found that the "nonconsensual extraction of blood and saliva from persons convicted of the sex offenses enumerated in section 5—4—3 of the Unified Code of Corrections does not offend traditional fourth amendment principles." *Wealer*, 264 Ill. App. 3d at 15.

In oral arguments in the case at bar, defense counsel argued that *Garvin*'s utilization of the reasoning in *Wealer*, in effect, contravened the intent of the United States Supreme Court in *Edmond* and *Ferguson*, where the Court utilized the "special needs" test. However, we note that nowhere in *Edmond* or *Ferguson* does the Supreme Court state that the "special needs" test should be employed to the express exclusion of the balancing test favored by both *Garvin* and *Wealer*. Moreover, we note that neither *Edmond* nor *Ferguson* condemns the suspicionless extraction of DNA of convicted felons in the absence of a

"special need" separate from law enforcement concerns; *Edmond* dealt with random vehicle checkpoints in an effort to confiscate illegal drugs, and *Ferguson* dealt with whether hospitals could share pregnant women's positive drug tests with police to quell the incidence of drug-addicted newborns.

More recently, the Supreme Court released a related decision in *United States v. Knights*, 534 U.S. 112, 151 L. Ed. 2d 497, 122 S. Ct. 587 (2001). There, the trial court sentenced the defendant to probation for a drug offense, but required the defendant to submit to a search at any time, with or without a search or arrest warrant or probable cause by any probation or law enforcement officer, as a condition of that probation. *Knights*, 534 U.S. at 114, 151 L. Ed. 2d at 502, 122 S. Ct. at 589. Thereafter, the police searched the defendant's apartment and found evidence, *inter alia*, that the defendant was engaged in a conspiracy to commit arson. *Knights*, 534 U.S. at 115, 151 L. Ed. 2d at 502-03, 122 S. Ct. at 589. On appeal to the Supreme Court, he argued that the police's search of his apartment violated his fourth amendment rights, where the search did not satisfy a particular "special need" of the State. *Knights*, 534 U.S. at 117, 151 L. Ed. 2d at 504, 122 S. Ct. at 590. In other words, defendant argued that because the search pursuant to his probation condition was not carried out pursuant to some "probationary" purpose, it was carried out unconstitutionally.

In assessing the constitutionality of that search, the Supreme Court noted that "[i]nherent in the very nature of probation is that probationers 'do not enjoy "the absolute liberty to which every citizen is entitled." ' [*Griffin v. Wisconsin*, 483 U.S. 868, 874, 97 L. Ed. 2d 709, 718, 107 S. Ct. 3164, 3169 (1987)] (quoting *Morrisey* v. *Brewer*, 408 U.S. 471, 480[, 33 L. Ed. 2d 484, 494, 92 S. Ct. 2593, 2600 (1972)])." *Knights*, 534 U.S. at 119, 151 L. Ed. 2d at 505, 122 S. Ct. at 591. To that end, the Court also found that the search condition of the defendant's probation "significantly diminished [his] reasonable expectation of privacy." *Knights*, 534 U.S. at 120, 151 L. Ed. 2d at 505, 122 S. Ct. at 592. Accordingly, the Court opted not to employ the "special needs" test but, rather, sought to determine the "reasonableness" of the search " 'by assessing, on the one hand, the degree to which it intrude[d] upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' *Wyoming* v. *Houghton*, 526 U.S. 295, 300[, 143 L. Ed. 2d 408, 414, 119 S. Ct. 1297, 1300] (1999)." *Knights*, 534 U.S. at 118-19, 151 L. Ed. 2d at 505, 122 S. Ct. at 591.

The *Knights* Court reasoned that the "special needs" test need not be used in instances where a court's holding "rests on ordinary

Fourth Amendment analysis that considers all the circumstances of a search." *Knights*, 534 U.S. at 122, 151 L. Ed. 2d at 507, 122 S. Ct. at 593. The Court even went so far as to say "[w]ith the limited exception of some special needs and administrative search cases, see *Indianapolis v. Edmond*, 531 U.S. 32, 45[, 148 L. Ed. 2d 333, 346, 121 S. Ct. 447, 456] (2000), 'we have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers.' *Whren v. United States*, 517 U.S. 806, 813[, 135 L. Ed. 2d 89, 98, 116 S. Ct. 1769, 1774] (1996)." *Knights*, 534 U.S. at 122, 151 L. Ed. 2d at 507, 122 S. Ct. at 593. However, the *Knights* Court concluded that because the defendant's status as a probationer weighed against him in both sides of the balancing test, *and* because the police had some reasonable suspicion that the defendant had committed a crime, the police's warrantless search of his apartment was reasonable and, thus, constitutional. *Knights*, 534 U.S. at 122, 151 L. Ed. 2d at 507, 122 S. Ct. at 593. In that regard, the Court made careful note:

> "We do not decide whether the probation condition so diminished, or completely eliminated, Knights's reasonable expectation of privacy *** that a search by a law enforcement officer without any individualized suspicion would have satisfied the reasonableness requirement of the Fourth Amendment. The terms of the probation condition permit such a search, but we need not address the constitutionality of a suspicionless search because the search in this case was supported by reasonable suspicion." *Knights*, 534 U.S. at 120 n.6, 151 L. Ed. 2d at 505 n.6, 122 S. Ct. at 592 n.6.

In other words, the *Knights* Court was unwilling to find that the very fact that an individual was a probationer would allow the State to perform a suspicionless search without any individualized suspicion and, in turn, allow for a judicial assessment of the reasonableness of a probationer's search without employing "special needs" analysis.

More recently, in *People v. Lampitok*, 207 Ill. 2d 231 (2003), the Illinois Supreme Court confronted the issue of whether the suspicionless search of the motel room of probationer Kitty Bircher, whose probation was also conditioned upon a search condition, violated her fourth amendment rights. *Lampitok*, 207 Ill. 2d at 239. Discussing footnote 6 of *Knights*, the *Lampitok* court remarked that "[t]he [*Knights*] Court recognized a correlation between the terms of the probation search condition and the degree of the probationer's expectation of privacy, which in turn influences the level of individualized suspicion required to justify a search." *Lampitok*, 207 Ill. 2d at 251. In that regard, the court noted that because Bircher had agreed to a "more limited" probation search condition than Knights, "her expectation of privacy was not as diminished, and more individualized

suspicion was required by the fourth amendment than would have been required for Knights." *Lampitok*, 207 Ill. 2d at 251. Noting that the *Knights* court never decided the minimum level of individualized suspicion necessary under the fourth amendment to perform a suspicionless search on Knights, it concluded that its comparison of Knights's expectations of privacy relative to Bircher's "lends support to the assertion that a probation search of Bircher upon no individualized suspicion would be constitutionally unreasonable." *Lampitok*, 207 Ill. 2d at 252.

In other words, the Illinois Supreme Court viewed Bircher's relative expectation of privacy as a determining factor for whether the police's search of her motel room needed to be performed attendant to *some* individualized suspicion to meet the requirements of the fourth amendment. Based on that analysis, we conclude, under *Lampitok*, that if a probationer has a relatively low expectation of privacy—say, as compared to the defendant in *Knights*—it is still entirely reasonable within the ambit of the fourth amendment for a search to be performed on that person without any individualized suspicion. But *cf. Lampitok*, 207 Ill. 2d at 253 ("[e]ven though the Supreme Court has not yet directly addressed [the issue of the minimum level of *individualized suspicion that would satisfy the fourth amendment*], we note that the clear majority of federal courts of appeals also require reasonable suspicion to support a probation search").

In the present case, therefore, we must assess the defendant's expectation of privacy in the retention of his DNA to determine, under *Lampitok*, whether any modicum of individualized suspicion is necessary to extract his DNA. Making a similar determination, the *Wealer* court drew upon a decision of the Federal Court of Appeals for the Fourth Circuit, which likened DNA extraction to the taking of fingerprints:

" '[W]hen a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it. We accept this proposition because the identification of suspects is relevant not only to solving the crime for which the suspect is arrested, but also for maintaining a permanent record to solve other past and future crimes. This becomes readily apparent when we consider the universal approbation of "booking" procedures that are followed for every suspect arrested for a felony, whether or not the proof of a particular suspect's crime will involve the use of fingerprint identification. *** While we do not accept even this small level of intrusion for free persons without Fourth Amendment constraint [citation], the *same protections do not hold true for those lawfully confined to the*

custody of the state.' " *Wealer*, 264 Ill. App. 3d at 17, quoting *Jones v. Murray*, 962 F.2d 302, 306 (4th Cir. 1992).

This is even made more clear by the *Lampitok* court's implication that federal courts of appeals have found only warrantless suspicionless searches of a person's body to be constitutionally reasonable, as opposed to searches of a person's home, where "a search of a person's home, whether consisting of one room or an entire house, cannot be characterized as a minor invasion of privacy. *Chimel v. California*, 395 U.S. 752, 766 & n.12, 23 L. Ed. 2d 685, 695-96 & n.12, 89 S. Ct. 2034, 2041-42 & n.12 (1969)." *Lampitok*, 207 Ill. 2d at 254.

Like the court in *Wealer* and *Murray*, we also think that the defendant here, as a detainee of the State, has virtually no privacy interest in the retention of his DNA. Accordingly, we conclude that the extraction of his DNA, without any individualized suspicion, could still be constitutionally reasonable under *Lampitok*, without having to engage in a "special needs" analysis.

Most recently, in *United States v. Kincade*, 379 F.3d 813 (9th Cir. 2004), the Ninth Circuit Federal Court of Appeals also discussed the potential impact of footnote 6 in *Knights*:

> "The only rational interpretation of *Knights*'s express reservation is that—without regard to the Court's prior decisions in *Edmond* and *Ferguson*—it remains *entirely* an open question whether suspicionless searches of conditional releasees pass constitutional muster when such searches are conducted for law enforcement purposes." (Emphasis in original.) *Kincade*, 379 F.3d at 830.

Thereafter, the *Kincade* court noted that while other circuits and states were divided on the issue of whether to employ a "special needs" analysis (*Kincade*, 379 F.3d at 830-31), its own 1995 decision in *Rise v. Oregon*, 59 F.3d 1556 (9th Cir. 1995), upheld the constitutionality of a state DNA collection statute by applying a pure totality of the circumstances analysis. *Kincade*, 379 F.3d at 831-32. Accordingly, the court followed its own precedent in *Rise* and held that *Rise*'s reliance upon a totality of the circumstances test "both comports with the Supreme Court's recent precedents and resolves this appeal in concert with the requirements of the Fourth Amendment." *Kincade*, 379 F.3d at 832.

In so holding, the *Kincade* court reaffirmed its decision in *Rise* by distinguishing both *Edmond* and *Ferguson*:

> "As we have stressed, neither *Edmond* nor *Ferguson* condemns suspicionless searches of conditional releasees in the absence of a demonstrable 'special need' apart from law enforcement. Indeed, *Ferguson* explicitly distinguished itself from cases addressing the constitutionality of parole and probation searches—thus recognizing a constitutionally significant distinction between searches of

conditional releasees and searches of the general public, and laying the framework for a jurisprudentially sound analytic division between these two classes of suspicionless searches. *See Ferguson*, 532 U.S. at 79 n.15, 121 S. Ct. 1281 ('[W]e agree with petitioners that *Griffin* is properly read as limited by the fact that probationers have a lesser expectation of privacy than the public at large.') (citing *Griffin*, 483 U.S. at 874-75, 107 S. Ct. 3164). And *Knights*, of course, affirmed the post-*Edmond*, post-*Ferguson* possibility that conditional releasees' diminished expectations of privacy may be sufficient to justify the judicial assessment of a parole or probation search's reasonableness outside the strictures of special needs analysis. *Knights*, 534 U.S. 117-18, 119-20 & n.6, 122 S. Ct. 587." *Kincade*, 379 F.3d at 832.

In the present case, we note that two districts of this court have already upheld the constitutionality of the predecessor sex offender statute by using a pure totality of the circumstances test. See *Wealer*, 264 Ill. App. 3d 6 (2nd Dist. 1994); *People v. Calahan*, 272 Ill. App. 3d 293 (1st Dist. 1995). Like the *Kincade* court, we agree that where neither *Ferguson* nor *Edmond* has spoken to the issue of whether the State needs to demonstrate a special need to perform suspicionless searches on convicted felons, and where *Knights* "entirely" leaves that question unanswered, we too follow our own existing precedent in *Wealer* and *Calahan* and employ the totality of the circumstances test.

Turning to the actual analysis, we note that the physical intrusion imposed by the testing mandated under section 5—4—3 previously has been found to be insubstantial and to pose no threat to the health or safety of the individual tested. *Wealer*, 264 Ill. App. 3d at 16, citing *People v. Adams*, 149 Ill. 2d 331, 346 (1992) (statute mandating that persons convicted of certain offenses undergo blood testing for presence of HIV). Indeed, the *Garvin* court pointed out the Supreme Court's recognition that a blood draw is not an " 'unduly extensive imposition' [citation]" and " 'would not be considered offensive by even the most delicate' [citation]." *Garvin*, 349 Ill. App. 3d at 856. Therefore, the use of oral or nasal swabs to obtain similar DNA would have even less of an intrusive effect.

Thereafter, it becomes necessary to balance the government's interest in collecting DNA samples from potential recidivists, the degree to which section 5—4—3(a)(3.5) furthers that interest, and the extent to which that search intrudes on a criminal's privacy rights.

We agree with the State that it has a legitimate interest in deterring and prosecuting criminals, as well as in establishing the identity of felony offenders where traditional methods of identification might prove otherwise inadequate or inconclusive. Moreover, in addition to solving

future crimes, the DNA testing scheme is related to the State's interest in deterring and prosecuting recidivist acts because it provides an improved technological method for identifying and eliminating potential suspects. See *Garvin*, 349 Ill. App. 3d at 855, citing *Wealer*, 264 Ill. App. 3d at 17. While defendant asserts that the nexus is too tentative, as nonsexual offenders rarely leave behind traces of DNA evidence at the crime scene, we think that defendant's approach ignores the many possibilities which do in fact exist: the burglar who sneezes, cuts his finger when breaking into a home, or sips from a homeowner's prized bottle of 1990 Dom Perignon; the mugger who gets some of his blood on his victims' shirts; the crack dealer who hides his wares in his mouth, etc. Invariably, therefore, there are instances—quite possibly many instances—in which a nonsexual offender may leave remnants of his genetic makeup. Because section 5—4—3(a)(3.5) would ultimately serve to identify the culprits of such offenses, we find the State's interest in obtaining these samples to be incontrovertible.

Recently, a First District decision affirmed the constitutionality of the drawing of blood pursuant to the statute and applied the balancing test as its standard. *People v. Hall*, 352 Ill. App. 3d 537 (2004).

Finally, we also agree with *Garvin* that the privacy interest that a felony offender has in his or her identity is minimal or, at the very least, reduced. *Garvin*, 349 Ill. App. 3d at 855, citing *Griffin*, 483 U.S. 868, 97 L. Ed. 2d 709, 107 S. Ct. 3164; *Hudson*, 468 U.S. 517, 82 L. Ed. 2d 393, 104 S. Ct. 3194 (held that convicted persons lose some rights to personal privacy). And as noted above, we agree with *Wealer*'s adoption of *Murray*'s determination that extracting DNA from criminals is tantamount to the taking of their fingerprints. *Wealer*, 264 Ill. App. 3d at 17, quoting *Murray*, 962 F.2d at 306.

In the end, because we, like the courts in *Wealer*, *Garvin*, and *Hall* think that the extraction of a convicted felon's DNA under section 5—4—3(a)(3.5) is the functional equivalent to fingerprinting—which is another minimal intrusion upon a diminished privacy interest—we hold that a warrantless and suspicionless blood extraction of Illinois felony offenders, as described in section 5—4—3(a)(3.5), does not violate the fourth amendment prohibition against unreasonable searches and seizures.

For the foregoing reasons, we affirm the defendant's conviction and sentence.

Affirmed.

JUSTICE THEIS, specially concurring:

I agree with the result reached in this case, but because I would have analyzed the DNA issue differently, I specially concur.

In Justice Greiman's opinion, he applies a totality of the circumstances analysis and a balancing test when determining whether the suspicionless search of a convicted felon to obtain his DNA ran afoul of the fourth amendment. In doing so, he relies on *Wealer*. The *Wealer* court, citing *Sitz*, noted that the balancing test approach "relies primarily on the perceived willingness of the United States Supreme Court, under certain circumstances, to relax or eliminate any requirement of probable cause or individualized suspicion where the nature of the intrusion occasioned by a particular search or seizure is minimal and the government's interest significant." *Wealer*, 264 Ill. App. 3d at 14. The *Wealer* court decided to follow this balancing test although it noted that the Supreme Court had not applied this approach outside the context of police stops of motorists on public highways. *Wealer*, 264 Ill. App. 3d at 14. Because the Supreme Court in *Ferguson* recently distinguished its previous cases involving roadblocks such as *Sitz* and did not apply the balancing test in a case involving a search of a person's body, I write specially.

First, I note that while the United States Supreme Court has yet to address this exact issue, many courts around the country have found the suspicionless search of a convicted felon to obtain his DNA to be constitutional. See *Garvin*, 349 Ill. App. 3d at 854 (compiling a list of federal and state cases upholding the constitutionality of this search). While these courts have uniformly reached the same constitutional result, they contain no uniform analysis and frequently include numerous dissents and concurrences.

The Supreme Court has held that a search or seizure is "ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *Edmond*, 531 U.S. at 37, 148 L. Ed. 2d at 340, 121 S. Ct. at 451. The Court has recognized only limited circumstances in which the usual rule did not apply, such as where the program was designed to serve "special needs, beyond the normal need for law enforcement." *Edmond*, 531 U.S. at 37, 148 L. Ed. 2d at 340, 121 S. Ct. at 451, citing *Vernonia School District 47J v. Acton*, 515 U.S. 646, 664-65, 132 L. Ed. 2d 564, 582, 115 S. Ct. 2386, 2396 (1995) (random drug testing for student-athletes); *Von Raab*, 489 U.S. at 679, 103 L. Ed. 2d at 710-11, 109 S. Ct. at 1398 (drug tests for United States Customs Service employees seeking transfer or promotion to certain positions); *Skinner*, 489 U.S. at 633-34, 103 L. Ed. 2d at 670-71, 109 S. Ct. at 1422 (drug and alcohol tests for railway employees involved in train accidents or found to be in violation of particular safety regulations). Additionally, the Court has also allowed searches for certain administrative purposes without particularized suspicion, provided that those searches were appropriately limited. See, *e.g.*, *Burger*, 482 U.S. at 702-

04, 96 L. Ed. 2d at 613-15, 107 S. Ct. at 2643-44 (warrantless administrative inspection of premises of "closely regulated" business). Lastly, the Supreme Court has upheld brief, suspicionless seizures of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens (*United States v. Martinez-Fuerte*, 428 U.S. 543, 566-67, 49 L. Ed. 2d 1116, 1133-34, 96 S. Ct. 3074, 3087 (1976)) and at a sobriety checkpoint aimed at removing drunk drivers from the road (*Sitz*, 496 U.S. at 455, 110 L. Ed. 2d at 423, 110 S. Ct. at 2488).

In his opinion, Justice Greiman cites the recent Supreme Court case of *Ferguson*, but does not rely on it. While *Ferguson* presents a different issue from that in the present case, it involves the search of a person, as does this case, and I would follow its analysis here. In *Ferguson*, the Court addressed whether a state hospital's action of testing urine samples of pregnant women for narcotics without their consent or individualized suspicion for law enforcement purposes was an unreasonable search. *Ferguson*, 532 U.S. at 69-70, 149 L. Ed. 2d at 211, 121 S. Ct. at 1284. In analyzing this issue, the Court stated that *Ferguson* differed from "the handful of seizure cases in which we have applied a balancing test to determine Fourth Amendment reasonableness," citing *Sitz* and *Martinez-Fuerte*. *Ferguson*, 532 U.S. at 83 n.21, 149 L. Ed. 2d at 220 n.21, 1121 S. Ct. at 1291 n.21. The Court reasoned that *Sitz* and *Martinez-Fuerte* involved roadblock seizures rather than " 'the intrusive search of the body or the home.' " *Ferguson*, 532 U.S. at 83 n.21, 149 L. Ed. 2d at 220 n.21, 121 S. Ct. at 1291 n.21, quoting *Edmond*, 531 U.S. at 55, 148 L. Ed. 2d at 352, 121 S. Ct. at 461 (Rehnquist, C.J., dissenting). The Court also noted that, " '[W]e deal neither with searches nor with the sanctity of private dwellings, ordinarily afforded the most stringent Fourth Amendment protection.' " *Ferguson*, 532 U.S. at 83 n.21, 149 L. Ed. 2d at 220 n.21, 121 S. Ct. at 1291 n.21, quoting *Martinez-Fuerte*, 428 U.S. at 561, 49 L. Ed. 2d at 1130, 96 S. Ct. at 3084. Lastly, the Court explained that it had "explicitly distinguished the cases dealing with checkpoints from those dealing with 'special needs' " in *Sitz*. *Ferguson*, 532 U.S. at 83 n.21, 149 L. Ed. 2d at 220 n.21, 121 S. Ct. at 1291 n.21.

Rather, the *Ferguson* Court applied the "special needs" analysis, relying on four previous cases where it had considered whether comparable drug tests " 'fit within the closely guarded category of constitutionally permissible suspicionless searches.' " *Ferguson*, 532 U.S. at 77, 149 L. Ed. 2d at 216, 121 S. Ct. at 1288, quoting *Chandler v. Miller*, 520 U.S. 305, 309, 137 L. Ed. 2d 513, 520, 117 S. Ct. 1295, 1298 (1997). See also *Vernonia*, 515 U.S. at 664-65, 132 L. Ed. 2d at 582, 115 S. Ct. at 2396; *Von Raab*, 489 U.S. at 679, 103 L. Ed. 2d at 710-11, 109 S. Ct. at 1398; *Skinner*, 489 U.S. at 633-34, 103 L. Ed. 2d

at 670-71, 109 S. Ct. at 1422. In each of those cases, the Court "employed a balancing test that weighed the intrusion on the individual's interest in privacy against the 'special needs' that supported the program." *Ferguson*, 532 U.S. at 78, 149 L. Ed. 2d at 216, 121 S. Ct. at 1288. However, before conducting this balancing test, the Court first determined whether the need in question was "special." In making that determination, the *Ferguson* Court carried out a "close review" of the scheme at issue and considered all of the available evidence to determine the relevant primary purpose of the program. *Ferguson*, 532 U.S. at 81, 149 L. Ed. 2d at 218, 121 S. Ct. at 1290. The Court stated that in each of its prior drug cases, the "special need" that was advanced as a justification for the absence of a warrant or individualized suspicion "was one divorced from the State's general interest in law enforcement." *Ferguson*, 532 U.S. at 79, 149 L. Ed. 2d at 217, 121 S. Ct. at 1289. After reviewing the evidence in *Ferguson*, the Court found that the immediate objective of the searches was "to generate evidence *for law enforcement purposes* in order to reach" the ultimate goal of moving pregnant women into substance abuse treatment and away from drugs. (Emphasis in original.) *Ferguson*, 532 U.S. at 83, 149 L. Ed. 2d at 219-20, 121 S. Ct. at 1291.

The Court then held that given that the primary purpose of the hospital's program was to use the threat of arrest and prosecution in order to force women into treatment, and given the extensive involvement of law enforcement officials at every stage of the policy, "this case simply does not fit within the closely guarded category of 'special needs.' " *Ferguson*, 532 U.S. at 84, 149 L. Ed. 2d at 220, 121 S. Ct. at 1292. Because it determined that there was no "special need" to support the hospital's program, the Court struck down the program as unconstitutional without conducting the balancing test described above.

Additionally, the United States Supreme Court has stated that "[a] State's operation of a probation system, like its operation of a school, government office or *prison*, or its supervision of a regulated industry, likewise presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." (Emphasis added.) *Griffin*, 483 U.S. at 873-74, 97 L. Ed. 2d at 717, 107 S. Ct. at 3168. Based on both *Griffin* and *Ferguson*, I would find that this court must use the "special needs" analysis in addressing the constitutionality of the DNA statute at issue here.

First, the court should determine the primary purpose behind the program in question, here, the suspicionless search of a convicted felon to obtain his DNA as provided for under section 5—4—3(a)(3.5).

If that purpose is merely to serve the ordinary needs of law enforcement or the general interest in crime control, this purpose will not fit within the narrow category of "special needs" cases. See *Ferguson*, 532 U.S. at 79-81, 149 L. Ed. 2d at 217-18, 121 S. Ct. at 1289-90. If, however, the primary purpose of the program is something other than the State's general interest in law enforcement, *Ferguson* indicates that the program may fall within the "special needs" exception. Only after determining that the primary purpose of the DNA collection program involved in this case is "divorced from" the State's general interest in law enforcement and that the purpose falls within the "special needs" exception can this court apply a balancing test.

I would agree with the Seventh Circuit Court of Appeals that the primary purpose of the DNA law at issue here was "not to search for 'evidence' of criminal wrongdoing," but was "to obtain reliable proof of a felon's identity." *Green v. Berge*, 354 F.3d 675, 678 (7th Cir. 2004).[3] Given that the primary purpose of the DNA collection statute in Illinois is not merely to serve the ordinary needs of law enforcement, it falls within the category of "special needs."

Next, I believe this court must weigh the intrusion on the individual's interest in privacy against the "special needs" that supported the program. *Ferguson*, 532 U.S. at 78, 149 L. Ed. 2d at 216, 121 S. Ct. at 1288. Here, the individuals subject to the mandatory collection of DNA are convicted felons, not unsuspecting pregnant women in a hospital as in *Ferguson*. The "inmates subject to testing because they are in custody[ ] are already 'seized.' " *Green*, 354 F.3d at 679. Further, the collection of DNA only minimally intrudes into the convicted felons' privacy, especially considering that these individuals enjoy lesser privacy interests than the average person after they have been convicted of a crime and are incarcerated.

Additionally, the practice of collecting DNA from a blood sample is relatively noninvasive and does not "constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity." *Winston*, 470 U.S. at 762, 84 L. Ed. 2d at 670, 105 S. Ct. at 1617. Unlike the pregnant women seeking prenatal care in *Ferguson*, convicted felons are not simply receiving medical treatment and know the purpose and potential uses of the DNA test results. *Green*, 354 F.3d at 678-79. Moreover, DNA is the most reliable evidence of identification—stronger even than fingerprints or photographs. *Green*, 354 F.3d at 679. Thus, after balancing the individuals' interest in privacy

---

[3]While *Green* interprets the Wisconsin mandatory DNA statute, our Illinois statute is similar to and operates in the same manner as the Wisconsin statute, and thus, *Green*'s analysis is applicable here.

against the State's "special need" to obtain reliable proof of a felon's identity, I would agree with Justice Greiman that the suspicionless search of a convicted felon to obtain his DNA does not violate the fourth amendment.

Finally, I note that Justice Greiman's opinion relies on *Knights* in support of its analysis that the totality of the circumstances approach applies here. However, *Knights* is inapplicable to the present case because the *Knights* Court analyzed only whether a search conducted pursuant to the defendant's probation condition and supported by reasonable suspicion satisfied the fourth amendment. The *Knights* Court expressly stated that it need not address the constitutionality of a suspicionless search "because the search in this case was supported by reasonable suspicion." *Knights*, 534 U.S. at 120 n.6, 151 L. Ed. 2d at 505 n.6, 122 S. Ct. at 592 n.6. Thus, I do not believe that *Knights* provides any insight into whether the DNA statute at issue is constitutional.

Accordingly, I concur with the result of the majority in affirming this case.

JUSTICE QUINN, specially concurring.

I completely concur with the decision reached in this opinion. I write separately because I agree with the Fourth Circuit of the United States Court of Appeals that neither the "special needs" exception to suspicionless searches nor the "balancing test" applies to convicted felons who are compelled by court order at sentencing to provide a sample of their blood, saliva or tissue for DNA analysis. See *Jones v. Murray*, 962 F.2d 302, 307 n.2 (4th Cir. 1992).

In the instant case, defendant was ordered at the time of sentencing to supply a specimen of blood for analysis and categorizing into genetic marker groupings pursuant to section 5—4—3, *"Persons convicted of, or found delinquent for, certain offenses or institutionalized as sexually dangerous; specimens; genetic marker groups."* (Emphasis added.) 730 ILCS 5/5—4—3 (West 2002). In pertinent part, section 5—4—3(a)(3.5) provides:

> "Any person *** convicted or found guilty of any offense classified as a felony under Illinois law *** shall, regardless of the sentence or disposition imposed, be required to submit specimens of blood, saliva, or tissue to the Illinois Department of State Police in accordance with the provisions of this Section, provided such person is:
>
> * * *
>
> (3.5) convicted or found guilty of any offense classified as a felony under Illinois law *** on or after the effective date of this

amendatory Act of the 92nd General Assembly [August 22, 2002.]" 730 ILCS 5/5—4—3(a)(3.5) (West 2002).

"730 ILCS" is the Unified Code of Corrections. Chapter 5 of the Unified Code of Corrections is entitled "SENTENCING." Article 4 of chapter 5 is also entitled "SENTENCING." Clearly then, at least under Illinois' statutory scheme, court orders entered pursuant to section 5—4—3(a)(3.5) are entered as a part of a convicted felon's sentence. Consequently, a court order entered pursuant to section 5—4—3(a)(3.5) may only be entered after the defendant has been found guilty of a felony beyond a reasonable doubt. These requirements (a felony conviction and a court order) provide substantially more protection to defendants than do the requirements of a search warrant, or the requirements of any "special needs" exception (see *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 148 L. Ed. 2d 333, 340-41, 121 S. Ct. 447, 451-52 (2000); *Ferguson v. City of Charleston*, 532 U.S. 67, 84, 149 L. Ed. 2d 205, 220, 121 S. Ct. 1281, 1292 (2001); *Green v. Berge*, 354 F.3d 675, 677-78 (7th Cir. 2004)), balancing test (see *People v. Wealer*, 264 Ill. App. 3d 6, 14, 636 N.E.2d 1129 (1994); *People v. Garvin*, 349 Ill. App. 3d 845, 855, 812 N.E.2d 773, 782 (2004)), or consideration of the "totality of the circumstances" (see *People v. Lampitok*, 207 Ill. 2d 231, 249, 798 N.E.2d 91 (2003)).

In *Lampitok*, our supreme court reviewed the holdings in *United States v. Knights*, 534 U.S. 112, 151 L. Ed. 2d 497, 122 S. Ct. 587 (2001), and *Griffin v. Wisconsin*, 483 U.S. 868, 97 L. Ed. 2d 709, 107 S. Ct. 3164 (1987), and applied the totality of the circumstances test to determine whether a search of a probationer's motel room was reasonable at its inception and in its scope under the fourth amendment. *Lampitok*, 207 Ill. 2d at 249. The supreme court concluded that under the facts of that case, "a probation search of [the probationer] upon no individualized suspicion would be constitutionally unreasonable." *Lampitok*, 207 Ill. 2d at 252.

*Griffin*, *Knights* and *Lampitok* all involved searches of probationers' residences long after the individual probationer was placed on probation. Similarly, the court in *United States v. Kincade*, 379 F.3d 813, 839-40 (9th Cir. 2004) (*en banc*), found constitutional the DNA Analysis Backlog Act of 2000's (42 U.S.C. § 14135a(c)(1) through (c)(2) (2000)) requirement that certain federal offenders who were on parole, probation or supervised release submit to compulsory DNA profiling even though the offenders may have been sentenced years previously. In the instant case, the court order directing defendant to supply a blood sample was entered at the time of sentencing and it was contemplated that this would be a one-time occurrence which would be carried out immediately. This order is much less onerous than the

court orders at issue in *Griffin, Knights,* and *Lampitok,* all of which ostensibly deprived the probationers of any right to complain of any search that could take place anywhere or at any time, subject only to the whim or suspicion of a probation officer. Also, the instant order was entered at the time of sentencing, unlike the federal statute's compulsory DNA profiling which was imposed on defendants years after their sentences were imposed.

In *Hudson v. Palmer,* 468 U.S. 517, 524, 82 L. Ed. 2d 393, 402, 104 S. Ct. 3194, 3199 (1984), the Supreme Court considered "whether the Fourth Amendment applies within a prison cell." The *Hudson* Court first held: "The applicability of the Fourth Amendment turns on whether 'the person invoking its protection can claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action.' " *Hudson,* 468 U.S. at 525, 82 L. Ed. 2d at 402, 104 S. Ct. at 3199, quoting *Smith v. Maryland,* 442 U.S. 735, 740, 61 L. Ed. 2d 220, 226, 99 S. Ct. 2577, 2580 (1979).

Applying this standard to the issue before it, the Supreme Court held:

> "Notwithstanding our caution in approaching claims that the Fourth Amendment is inapplicable in a given context, we hold that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Hudson,* 468 U.S. at 525-26, 82 L. Ed. 2d at 402-03, 104 S. Ct. at 3200.

The Court explained that, in addition to the "institutional needs and objectives" of prison facilities, chief among which is internal security, the restrictions and retraction of rights from prisoners "also serve, incidentally, as reminders that, under our system of justice, deterrence and retribution are factors in addition to correction." *Hudson,* 468 U.S. at 524, 82 L. Ed. 2d at 401-02, 104 S. Ct. at 3199.

I believe that the analysis employed in *Hudson* is more appropriately applicable to the instant case than any of the other Supreme Court cases cited by either the State or defendant. A convicted felon cannot claim a "justifiable," "reasonable" or "legitimate" expectation of privacy in his blood, saliva or tissue when, at sentencing, the circuit court orders that the convicted person submit a sample of the same for purposes of DNA profiling. This is because (1) section 5—4—3(a)(3.5) provides more than adequate protection to

the rights of convicted felons; (2) the taking of blood, saliva or tissue samples pursuant to section 5—4—3(a)(3.5) is comparable to finger-printing; and (3) the taking of such samples strongly serves the recognized purpose of deterrence. Consequently, I agree with Justices Greiman and Theis and I would also affirm the constitutionality of section 5—4—3(a)(3.5).

As to defendant's expressed concern that the information gathered from defendant's DNA could be misused, subsection 5—4—3(f) provides that the genetic marker grouping analysis information obtained from the samples submitted by convicted individuals shall be confidential and may only be released to peace officers and prosecuto-rial agencies. 730 ILCS 5/5—4—3(f) (West 2002). Subsection (f) provides that the information attained from the samples shall be maintained in a single State databank, which may be uploaded into a national databank. These databanks serve the same purpose as does the National Crime Information Center's (NCIC) fingerprint data-bank, but with significantly more protection for the individuals who must submit samples for DNA profiling. The NCIC fingerprint data-bank contains millions of sets of fingerprints which are taken from ar-restees. In addition to verifying the identification of the arrestee, the fingerprint databank allows the police to quickly compare the fingerprints of arrestees with fingerprints recovered in connection with unsolved criminal cases. Section 5—4—3(a)(3.5) does not apply to mere arrestees. Rather, it applies only to convicted felons who are ordered at sentencing to submit samples for DNA profiling.

For the above-stated reasons I strongly concur.