2020 IL App (1st) 181092-U

FOURTH DIVISION
June 30, 2020

No. 1-18-1092

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13 CR 17455 |
| CARLOS RIVERA, | ) ) | |
| Defendant-Appellant. | ) ) | |
| | ) ) ) | Honorable Maura Slattery Boyle, Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Justice Lampkin concurred in the judgment.
Presiding Justice Gordon specially concurred.

**ORDER**

¶ 1    *Held*:    Reversing defendant's sentence where the record demonstrated the trial court failed to consider all the mitigating evidence and thus abused its discretion when sentencing the 18-year-old defendant.

¶ 2    Following a jury trial, defendant Carlos Rivera was found guilty of two counts of first-degree murder for the shooting death of Fernando Sanchez. He was 18 years old at the time of the offense. The jury also specially found that defendant personally discharged a firearm that

proximately caused the victim's death. The trial court merged the two murder counts and sentenced defendant to 35 years' imprisonment in the Illinois Department of Corrections for the murder and an additional 25 years' imprisonment for firearm enhancement, to be served consecutively, for a total of 60 years' imprisonment. On appeal, defendant raises the sole contention that his 60-year sentence was excessive where the trial court did not consider his mental health or his youth and rehabilitative potential when determining his sentence. For the reasons that follow, we reverse the sentence of the trial court and remand the matter for resentencing.

¶ 3                                    BACKGROUND

¶ 4      Because defendant does not raise any issues with his trial or the sufficiency of the evidence, we will set forth only those facts that are pertinent to the disposition of this appeal.

¶ 5      Defendant was charged in a six-count indictment with the first-degree murder of Sanchez that occurred on July 13, 2013. The matter proceeded to a jury trial where the following evidence was adduced. At approximately 2 a.m. on July 13, 2013, Sanchez was sitting on the front porch of an apartment building talking on his cell phone when defendant approached him, said "DK, Latin Kings," and fired three shots at Sanchez. Two of those shots struck Sanchez in his chest and back. The shooting was viewed by three eyewitnesses, Nichole Rivera,[1] Robert Torres, and Wilfredo Ramos, Jr. Each eyewitness identified defendant as the shooter in a lineup and at the trial.

¶ 6      After the shooting, Sanchez entered an apartment building seeking assistance. He knocked on the door of Sabrina Hernandez who, at the time, was hosting a slumber party for ten children. When Hernandez opened the door, Sanchez, who was bleeding profusely, stumbled

_____

[1] Nichole Rivera is not related to defendant.

into her apartment and fell onto the children who were asleep on the floor. The paramedics arrived shortly thereafter and transported the victim to the hospital where he later succumbed to his injuries.

¶ 7    The prosecution also presented evidence of a handwritten letter from defendant to one of his friends wherein he instructed his friend to pay eyewitness Torres "5 bills" to testify that defendant was not the shooter. In the letter defendant did not deny his involvement in the murder.

¶ 8    Defendant's mother, Maribely Rodriguez, testified in his defense that at 7 a.m. on July 12, 2013, defendant suffered a seizure, was treated at the hospital, and released at 10:28 a.m. This testimony was corroborated by the testimony of Kirsten Diest, a nurse from Norwegian American Hospital, who treated defendant. According to Rodriguez, after she brought defendant home from the hospital, he slept all day. Rodriguez further testified that she observed defendant at 12:30 a.m. on July 13, 2013, before she went to sleep and when she woke up at 5 a.m. defendant was sleeping in his bed. Rodriguez did not offer any testimony regarding defendant's mental health issues nor did she testify that this seizure had any impact on his actions.

¶ 9    Following closing arguments and jury instructions, the jury deliberated and ultimately found defendant guilty of first-degree murder and that he personally discharged a firearm causing Sanchez's death. Defendant filed a motion for a new trial which was denied.

¶ 10    A presentence investigation report (PSI) was prepared. The PSI indicated that defendant was a member of a street gang. Defendant also had no prior adjudications of delinquency, but he did have a prior misdemeanor conviction for reckless conduct for which he received two days in jail. The PSI further indicated that defendant had a pending two-count felony matter of possession of a weapon in a penal institution and aggravated battery involving great bodily harm.

Regarding his education, the PSI indicated defendant had attended school through eighth grade and thereafter attended an alternative school from which he was suspended on several occasions for fighting. Defendant completed "some high school" and he has never been employed. In addition, the PSI indicated defendant had been the victim of several acts of violence including being stabbed in the head and under his armpit when he was 14 years old. The defendant was also in a later incident where he was hit in the head with a brick resulting in his being in a month-long coma. Defendant also reported in the PSI that in 2013 he was shot in the head and arm and was hospitalized for one day. Defendant disclosed that he currently takes anti-seizure medication. Under the category "Psychological" the PSI included the following:

"Mr. Rivera was diagnosed with Bi-Polar Disorder, A.D.H.D. [attention deficit hyperactivity disorder] and an anger disorder.

While incarcerated at the Cook County Jail he was diagnosed with depression. He has been prescribed Effexor, Remron and Benedryl for the past year."

¶ 11 The matter then proceeded to a sentencing hearing. The State presented a victim impact statement from Sanchez's sister, Jessica Guzman, wherein she discussed the devastation and loss her family suffered as a result of defendant's actions. Guzman specifically noted that Sanchez's three young children, two of whom were diagnosed on the autism spectrum, had been left without a father. In aggravation, the State stressed the seriousness of the offense and that the victim had been shot for no apparent reason. The State further noted that during the pendency of this case defendant had authored a letter wherein he urged another individual to bribe a witness to lie under oath about what occurred on the evening of the murder.

¶ 12 In mitigation, defendant presented the testimony of his stepfather, David Waller. Waller testified that he had known defendant since defendant was six years old and that defendant "had

a good heart" and was "excellent in the classroom." Waller explained that at the time of the offense, defendant "was abusing alcohol to the extent that it was terrible." According to Waller, if defendant prevailed in this case there was a job waiting for him and he was going to help steer defendant in the right direction. The defense also presented a letter from defendant's mother. In the letter defendant's mother urged the court to have mercy on her son, who was 18 at the time of the offense, and stated he had a good heart.

¶ 13 Prior to issuing a sentence, the trial court inquired about whether defendant had been diagnosed by a physician with bipolar disorder, ADHD, and an anger disorder. Defense counsel replied that he had no evidence to corroborate defendant's self-reported statements to the probation officer in the PSI. Defense counsel also clarified that at no time during the pendency of the case was he aware that defendant suffered from any mental illness.

¶ 14 The trial court allowed the parties to argue one last time regarding the length of the sentence which the court should impose. The State did not ask for the maximum sentence but requested one that was over the minimum and "appropriate" considering the offense committed. Defense counsel requested the minimum sentence or, in the alternative, "something close to the minimum." In allocution, defendant stated that he was sorry for the loss of the victim but maintained his innocence.

¶ 15 The trial court merged the two murder counts and sentenced defendant to 35 years for first-degree murder and imposed the mandatory minimum sentence for firearm enhancement of 25 years. In so sentencing defendant, the trial court first acknowledged the letter defendant authored wherein he listed the witnesses' names, their addresses, and to promise them money to lie under oath. The court found the fact that the letter did not state he did not commit the crime and that it contained specific knowledge and detail of the events that transpired was of

significance. The trial court further noted the seriousness of the offense and the fact that numerous lives were affected by defendant's actions. In addition to Sanchez's family, the court observed that defendant's actions had a direct impact on "the people that had to see Mr. Sanchez in that state." Referring to Hernandez's testimony, the trial court stated, "I will never forget the woman that lived in the apartment that he stumbled into and how distraught she was in here talking about that." The trial court further stated it would "discount" the self-reported, uncorroborated statement of defendant that he suffered from bipolar disorder, ADHD, and an anger disorder. In crafting the sentence, the trial court stated "it is a crime that doesn't warrant the maximum, but it certainly doesn't warrant the minimum" and took into account defendant's lack of criminal record, his "association," his age, where he went to high school, and that he "had a loving family that tried to do their best" before sentencing defendant to 60 years' imprisonment.

¶ 16    Defendant thereafter filed a motion to reconsider his sentence, which the trial court denied. This appeal followed.

¶ 17                                ANALYSIS

¶ 18     Defendant's sole contention on appeal is that the trial court abused its discretion in sentencing him to 60 years' imprisonment. He asserts that the trial court failed to take into consideration his mental health status, age, and rehabilitative potential. For the reasons that follow, we vacate the sentence imposed by the trial court and remand the matter for resentencing.

¶ 19    A reviewing court will not disturb the trial court's sentencing decision absent an abuse of discretion. *People v. Sharp*, 2015 IL App (1st) 130438, ¶ 134. The trial court abuses its discretion when its decision is "fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." *People v. Ramos*, 353 Ill. App. 3d 133, 137 (2004).

Where, as here, the defendant's sentence falls within the prescribed statutory limits, the reviewing court will not find an abuse of that discretion unless the sentence is greatly at variance with the purpose and spirit of the law or is manifestly disproportionate to the offense. *People v. Means*, 2017 IL App (1st) 142613, ¶ 14.

¶ 20 Here, defendant was convicted of first-degree murder, for which the sentencing range is from 20 to 60 years' imprisonment. 730 ILCS 5/5-4.5-20(a) (West 2012). In addition, the trial court is required to impose a sentence enhancement of 25 years up to a term of natural life if there is a finding that the defendant personally discharged a firearm that proximately caused death. 730 ILCS 5/5-8-1(a)(l)(d)(iii) (West 2012). In the case at bar, the jury found that defendant personally discharged the firearm that proximately caused Sanchez's death. Defendant was sentenced to 35 years' imprisonment for the murder plus 25 years for the firearm enhancement, resulting in a total sentence of 60 years' imprisonment. Although defendant's sentence of 35 years' imprisonment for murder with a 25-year enhancement is 15 years above the 45-year minimum, it is well within the statutory sentencing range and is presumptively proper. See *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 105 ("When a trial court imposes a sentence within the permitted statutory range, as occurred in the case at bar, a reviewing court will start with the presumption that it is proper.").

¶ 21 While defendant acknowledges that his sentence is within the statutory range, he maintains that it nevertheless must be reduced because the trial court failed to consider certain factors in mitigation. Specifically, defendant asserts that the trial court failed to consider his mental health status, his age, and his rehabilitative potential. For the following reasons, we find the trial court failed to consider all of the mitigating factors and thus abused its discretion when sentencing defendant.

¶ 22   A sentence should reflect both the seriousness of the offense and the objective of restoring the offender to useful citizenship.  Ill. Const. 1970, art. I, § 11; *People v. Neasom*, 2017 IL App (1st) 143875, ¶ 48.  While a trial court must consider all factors in aggravation and mitigation, the seriousness of the offense, rather than mitigating evidence, is the most important factor in sentencing.  *People v. Kelley*, 2015 IL App (1st) 132782, ¶ 94.  The trial court is presumed to consider "all relevant factors and any mitigation evidence presented" (*People v. Jackson*, 2014 IL App (1st) 123258, ¶ 48), but has no obligation to recite and assign a value to each factor (*People v. Perkins*, 408 Ill. App. 3d 752, 763 (2011)).  Where, as here, a defendant argues that the court failed to properly consider certain factors, the defendant "must make an affirmative showing that the sentencing court did not consider relevant factors."  *People v. Burton*, 2015 IL App (1st) 131600, ¶ 38.

¶ 23   Furthermore, in fashioning a sentence, the trial court must consider all of the factors in mitigation and aggravation (*People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 27), and the particular circumstances of each case (*People v. Fern*, 189 Ill. 2d 48, 53 (1999)).  We presume the trial court considered all of the relevant factors before it, and without affirmative evidence that the sentencing court failed to consider evidence in mitigation, that presumption cannot be overcome.  *McWilliams*, 2015 IL App (1st) 130913, ¶ 27.  We defer to the trial court's judgment on sentencing as the lower court, " 'having observed the defendant and the proceedings, has a far better opportunity to consider [sentencing] factors than the reviewing court, which must rely on the 'cold' record.' " *People v. Alexander*, 239 Ill. 2d 205, 213 (2010) (quoting *Fern*, 189 Ill. 2d at 53).  We may not reverse defendant's sentence merely because we would have weighed the factors in aggravation and mitigation differently.  *Ramos*, 353 Ill. App. 3d at 137.  Nor will we find that a minimum sentence is necessarily warranted simply due to the existence of some

mitigating factors. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). Moreover, the existence of mitigating factors does not preclude imposition of the maximum sentence. *People v. Pippen*, 324 Ill. App. 3d 649, 652 (2001).

¶ 24    While defendant acknowledges that he was sentenced within the statutory range, he argues that the trial court abused its discretion when it failed to consider the mitigating evidence of his "struggle with mental health issues." Defendant maintains that the trial court erred in failing to consider his mental health issues where the probation department confirmed that defendant was diagnosed with depression while in jail for this offense and that defendant's mother also confirmed his bipolar and anger disorder diagnoses. Defendant further contends that, while the trial court was aware of his age, it did not consider how defendant's youthfulness and its attendant characteristics informed his thoughts and actions at the time of the offense. We observe that defendant does not assert that his sentence is unconstitutional under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) or the Eighth Amendment's prohibition on cruel and unusual punishment (U.S. Const., amend. VIII). Instead, defendant generally asserts that the trial court abused its discretion when it imposed a 60-year *de facto* life sentence and, as such, his sentence does not reflect an adequate application of the rehabilitative directive of the Illinois Constitution (Ill. Const. 1970, art. I, § 11 ("All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.")).

¶ 25    Defendant's main argument is that the trial court expressly declined to consider the information regarding his mental health status that was set forth in the PSI. As a reminder, in the PSI, defendant reported to the probation officer that he "was diagnosed with Bi-Polar Disorder, A.D.H.D. and an anger disorder." At the sentencing hearing, the trial court asked defense

counsel a series of questions regarding defendant's mental health status:

> "[Defense Counsel]: And he has been diagnosed with some mental health disorders, bipolar disorder, ADHD, anger disorder.
>
> THE COURT: At no time was there ever a bona fide concern or anything raised in regards to any mental health?
>
> [Defense Counsel]: No. We're not raising that at all, fitness or any issues with his mental health on the time of that date in particular.
>
> THE COURT: I just want it clear for the record.
>
> [Defense Counsel]: Yes. Just in terms of his psychological make-up, obviously all this has been, or has possibly a role in the complex person who is Carlos Rivera.
>
> THE COURT: You said ADHD, anger –
>
> [Defense Counsel]: And bipolar.
>
> THE COURT: Has anybody ever made that determination or is that a determination that's being suggested based on previous administered test in regards to determination of ADHD spectrum?
>
> [Defense Counsel]: This is the first time –
>
> THE COURT: This is problematic.
>
> [Defense Counsel]: No, and I understand.
>
> THE COURT: You know, and this is, you know, at no time in the pendency of this case now since 2013, 2015, if you as his attorney are now indicating that there has been a determination of bipolar after five years later –
>
> [Defense Counsel]: So the only reason I mention is because it's in the PSI. I had not had any indication.

THE COURT: But that is self-reporting. Self-reporting, that is not a determination by a doctor or any other treating physician is what is [*sic*] I'm saying. It's a self-reporting document that is indicated by Mr. Rivera.

[Defense Counsel]: Right. And this is the first notice I've had.

THE COURT: Right. But my point is, it's self-reporting, it's not by a doctor.

[Defense Counsel]: So what I'm saying is, I'm not aware.

THE COURT: What I'm saying is, it's self-reporting and not diagnosed by a doctor, correct?

[Defense Counsel]: Let me just –

THE COURT: It's self-reporting in the report generated and stated by Mr. Rivera to the Probation Department, correct?

[Defense Counsel]: Can I just ask my client for a second?

THE COURT: No. I'm asking you.

[Defense Counsel]: Because it says in there, I'm not sure how it got in there.

THE COURT: Well, was a doctor notified?

[Defense Counsel]: If I can just ask him for a second.

THE COURT: This is what I don't appreciate. You went over this with him, correct?

[Defense Counsel]: Yes, we did, yes.

THE COURT: Do you have any documentation from a physician, from a medical treating individual in regards to any mental health issues and/or diagnosis?

[Defense Counsel]: No, absolutely not.

THE COURT: Correct? Continue on.

[Defense Counsel]: And however, while in the jail, it says he was diagnosed with depression and he's –

THE COURT: Well, if anybody is in that place that isn't depressed –

[Defense Counsel]: I certainly understand that, Judge, absolutely. And he has been prescribed medication for sleeping. So I just wanted to – it's in the report so I just wanted to mention it."

Thereafter, in rendering the sentence, the trial court discussed defendant's mental health as self-reported in the PSI:

"And the issue in regards to the self-reporting, I want to make it clear, at no time in the last eight years has anybody ever mentioned any type of mental health issues, and I'm not going to have it brought up now. This is a self-reporting document. Nobody indicated they had a bona fide issue with your mental stability or mental health. This was something that was self diagnosed [*sic*] or self reported [*sic*] to the probation officer, and at no time did the court ever have any concern given your interaction with the court or the attorneys in regards that there was any issue that needed to be examined with regards to your mental health state. So the court is going to discount that statement, indicating that the depression and the ADHD, those may be the current situation and your prescribed sleeping pills, there has been none, and the court is not going to take or even have this record impugned or tarnished with an assertion at this moment of the bipolar disorder as it has never, ever in five years come to this court's attention nor any reason to nor any doctor nor any defense, any attorney, medical record or anything, so that that [*sic*] is discounted."

¶ 26    Our law is clear that, although the trial court cannot give mitigating evidence no weight

by excluding it from consideration, the court " 'may determine the weight to be given' " to that mitigating evidence. *People v. Chapman*, 194 Ill. 2d 186, 252-53 (2000) (quoting *People v. Davis*, 185 Ill. 2d 317, 344 (1998)). In this case, it is evident from the record that the trial court discounted the evidence presented regarding defendant's mental health. See *Burton*, 2015 IL App (1st) 131600, ¶ 38 (defendant "must make an affirmative showing that the sentencing court did not consider relevant factors."). We initially observe that the PSI indicated that the probation officer spoke with Chief Schultz from the Kankakee Correctional Center where defendant had been housed during the trial. It is apparent that any information coming from the correctional center and contained within the PSI was corroborated by Chief Schultz. This would include defendant's depression diagnosis. We further observe that it was the trial court that stated the defendant's mental health diagnoses were self-reported. When defense counsel requested to speak with his client regarding that particular reference in the PSI, the trial court did not allow defense counsel to do so and found, based on the court's own unsubstantiated belief, that defendant's mental health history was not corroborated. The failure to consider defendant's mental health status or, at a minimum, allow further inquiry by defense counsel, was a clear abuse of discretion. *McWilliams*, 2015 IL App (1st) 130913, ¶ 27; *Ramos*, 353 Ill. App. 3d at 137.

¶ 27    Defendant next asserts that, while the trial court was aware of his age, it did not consider how his youthfulness and its attendant characteristics informed his thoughts and actions at the time of the offense. We observe that defendant does not assert that his sentence is unconstitutional under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) or the Eighth Amendment's prohibition on cruel and unusual punishment (U.S. Const., amend. VIII). Instead, defendant generally asserts that the trial court abused its

discretion when it imposed a 60-year *de facto* life sentence and, as such, his sentence does not reflect an adequate application of the rehabilitative directive of the Illinois Constitution (Ill. Const. 1970, art. I, § 11 ("All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.")).

¶ 28    The defendant's age is one factor for consideration by a trial court in fashioning an appropriate sentence. *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 23. The trial court is presumed to have considered all relevant factors in fashioning a sentence and that presumption will not be overcome without explicit evidence that the trial court failed to consider mitigating factors. *Flores*, 404 Ill. App 3d at 158. The trial court need not give defendant's potential for rehabilitation greater weight than the seriousness of the offense. *People v. Anderson*, 325 Ill. App. 3d 624, 637 (2001).

¶ 29    Based on our conclusion that the trial court abused its discretion when it failed to consider defendant's mental health status, we need not specifically address defendant's contentions regarding his age and rehabilitative potential. When defendant is before the trial court for resentencing, he will be able to present evidence regarding these factors and the trial court will necessarily have to give full and due consideration to all of the factors in aggravation and mitigation as set forth in the sentencing statute. See *McWilliams*, 2015 IL App (1st) 130913, ¶ 27.

¶ 30    In sum, based on the record before us, we find that the trial court abused its discretion when it refused to consider defendant's mental health status when sentencing defendant. Accordingly, we vacate defendant's sentence and remand the matter for resentencing.

¶ 31                                  CONCLUSION

¶ 32    For the reasons set forth above, we affirm defendant's conviction, vacate his sentence,

and remand the matter for resentencing.

¶ 33    Reversed and remanded.

¶ 34    PRESIDING JUSTICE GORDON, specially concurring:

¶ 35    I concur that we must remand for resentencing, but I must write separately because:  (1) I would remand for resentencing before a different judge; (2)  the majority states that, "in the PSI, *defendant reported* to the probation officer that he 'was diagnosed with Bi-Polar Disorder, A.D.H.D. and an anger disorder,' " (emphasis added) (*supra* ¶ 25), although the record does not disclose whether these diagnoses were self-reported; (3) the majority finds that Chief Schultz of the Kankakee Correctional Center must have corroborated defendant's depression diagnosis *but not* defendant's other diagnoses, without any explanation for this selective finding (*supra* ¶ 26); and (4) I find defendant's age-based arguments persuasive, while the majority does not (*supra* ¶¶ 27-28).

¶ 36    The sole question on this appeal is whether the trial court abused its discretion when it imposed a *de facto* life sentence on an 18-year-old offender without considering his mental health or the attributes of his youth, where the PSI indicated that, prior to the offense, defendant had been stabbed in the head, hit in the head with a brick which had left him in a coma for a month, and shot in the head; where a nurse testified at trial that defendant had been hospitalized for a seizure the day before the offense; where he had been diagnosed while at Cook County jail with depression and had been prescribed medication for it; where he had previously been diagnosed with bipolar disorder, attention deficit hyperactivity disorder (ADHD), and an anger disorder; and where he had no prior felony convictions or juvenile adjudications.

¶ 37    In the case at bar, the trial court was faced with an unclear PSI report and the attorneys were unable to answer the court's questions so the court could better understand the PSI.  The

trial court abused its discretion when it assumed that the diagnoses stated in the PSI were not actual diagnoses but merely "self-reporting." The PSI stated unequivocally that defendant "*was diagnosed* with Bi-Polar Disorder, A.D.H.D. and an anger disorder." (Emphasis added.) The majority states that "defendant reported to the probation officer" these diagnoses. *Supra* ¶ 25. However, the sentencing transcript makes clear that finding is unsupported.

¶ 38    At sentencing, defense counsel argued defendant's diagnoses to the trial court, and the court asked if he was raising defendant's fitness as an issue. Defense counsel responded that, while he was not raising defendant's fitness to stand trial for the offense as an issue, he still was asking the court to consider defendant's "psychological makeup," as a mitigating factor in sentencing. The trial court then asked whether any tests had been administered and, when counsel responded that he did not know, the trial court observed that the absence of tests was "problematic," but did not continue the sentencing to determine the basis for the diagnoses contained in the PSI. The trial court expressed frustration with counsel who defended himself by arguing that he did not know about the diagnoses prior to the PSI. The trial court then stated that the diagnoses must be "self-reporting." When the trial court then asked counsel whether it was "self-reporting" or "by a doctor," counsel replied that he did not know. Twice more the court stated it was "self-reporting *** correct?" Defense counsel replied again: "I'm not sure how it got in there." When counsel asked if he could talk to his client, the court said "[t]his is what I don't appreciate. You went over this with him, correct?" The court then asked if counsel had any supporting documentation other than the PSI; when counsel said he did not, the court told him to move on.

¶ 39    I observe, first, that the State did not object at sentencing to the diagnoses in the PSI. Thus, any objection to it by the State was forfeited. Second, the "sources of information" listed

in the PSI included not only defendant's interview, arrest report and criminal history, but also "contact" with the "chief" at the Kankakee Correctional Center where defendant was housed. Thus, there was an additional possible source of relevant information besides defendant himself for the diagnoses of bipolar disorder, ADHD, and anger disorder. Third, the sentencing transcript reveals that the trial court may have confused the concept of fitness to stand trial as compared to the concept that a mental health condition could serve as a mitigating factor at sentencing. A defendant is unfit to stand trial if, based on a mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense. *People v. Cook*, 2014 IL App (2d) 130545, ¶ 12. By contrast, a mental illness may be a mitigating factor at sentencing, even if it is insufficient to undermine a defendant's fitness to stand trial. 730 ILCS 5/5-5-3.1(a)(16) (West 2016) (mental illness is one of the statutorily listed mitigating factors). Fourth, the record does not reveal when the defense and the trial court received the PSI and whether counsel had an opportunity to investigate its contents. Counsel stated that "this" was his "first notice" of the diagnoses in the PSI and that he was "not sure how it got in there." Lastly, to the extent that the trial judge found the lack of definitive testing "problematic," as she stated on the record, the solution was not simply to tell defense counsel to move on, as she did, but to find a way to ascertain the needed information prior to imposing a life sentence. Instead, the trial judge stated categorically that she was going to "discount" the diagnoses.

¶ 40    With respect to defendant's separate diagnosis of depression at Cook County Jail, the trial court disparaged it by stating "[w]ell, if anybody is in that place" they would be "depressed." That interjection seems to indicate a lack of understanding of the meaning of a depression diagnosis.

¶ 41 In addition, there was testimony in the trial record by both the mother and an unrelated nurse concerning defendant's severe health issues. Defendant's mother testified at trial that he had had seizures for two years prior to the offense and that they were so debilitating that, even when he was released from the hospital, he could not leave his bed. His mother testified that, the day before the offense, he returned home from the hospital at 11 a.m. and stayed in bed from 11 a.m. until 12:30 a.m., when she herself went to bed herself. During that time, he did not rise for food or to use the bathroom. She testified that this always happened when he had a seizure.

¶ 42 The trial court's complete disregard of all of defendant's diagnoses is particularly troubling, where there was evidence of numerous and severe head traumas, where a nurse testified about defendant's hospitalization for a seizure less than 24 hours before the offense, where defendant had no prior felony convictions or juvenile adjudications, and where defendant was only 18 years old at the time of the offense.

¶ 43 Except for making a bare statement that it had "taken into effect [defendant's] age," the trial court indicated no consideration of the particular attributes of youth with regard to this offender who was only three months past his 18th birthday.

¶ 44 Recent and traditional legislative enactments support the view that "youthful offender[s]" are those under the age of 21. 730 ILCS 5/3-3-9(a)(1.5) (West 2018) (parole review for under 21-year-olds is called "youthful offender parole"). For example, last year, our legislature changed the law to make a person convicted of first-degree murder eligible for parole after serving only 20 years, *if* he or she was under 21 years old at the time of the offense and was sentenced after the law took effect. Pub. Act 100-1182 (eff. June 1, 2019) amending 730 ILCS 5/5-4.5-110); Pub. Act 100-1182, § 5 (eff. Jan. 1, 2020) (amending 730 ILCS 5/5-4.5-110(b) and renumbering as 730 ILCS 5/5-4.5-115(b)). Urging passage of this bill, House Majority Leader

Barbara Flynn Currie argued that under-21-year-olds are "young people" who "do not always have good judgment." 100th Ill. Gen. Assem., House Proceedings, Nov. 28, 2018, at 48-49 (statements of Representative Currie). The Juvenile Court Act of 1987 (Act) defines a "[m]inor" as "a person under the age of 21 years subject to this Act" (705 ILCS 405/1-3(10), 405/5-105(10) (West 2018)), while an " '[a]dult means a person 21 years of age or older." (705 ILCS 405/1-3(2) (West 2018)). Our state treats under-21-year-olds differently in other ways, such as prohibiting sales to them of alcohol (235 ILCS 5/6-16(a)(i) (West 2018)), cigarettes (Pub. Act 101-2, §25 (eff. July 1, 2019) (amending 720 ILCS 675/1)), and wagering tickets (230 ILCS 10/18(b)(1) (West 2018)), prohibiting their gun ownership without parental permission (430 ILCS 65/4(a)((2)(i) (West 2018)) and limiting Class X sentencing for recidivist offenders to those offenders "over the age of 21 years" (730 ILCS 5/5-4.5-95(b) (West 2018)). See also *People v. Mosley*, 2015 IL 115872, ¶ 36 (a ban on handgun possession by " 'minors' " under 21 does not violate the second amendment); 760 ILCS 20/2(1) (West 2018) (Illinois Uniform Transfers to Minors Act defines an adult as one "21 years of age" or older). This under-21 defendant, in particular, deserves consideration of the attributes of youth, in light of his repeated and undisputed head traumas and their apparent debilitating effect on his health.

¶ 45    For all the foregoing reasons, I find that the trial court abused its discretion in sentencing defendant to a *de facto* life sentence and I would remand for resentencing before a different judge.[2]

---

[2] Since I decide this appeal on other grounds, I do not address defendant's constitutional argument that the trial court failed to adhere to its constitutional duty to impose a proportionate penalty aimed at returning an offender to useful citizenship. See *In re E.H.*, 224 Ill. 2d 172, 177 (2006) ("cases should be decided on nonconstitutional grounds whenever possible").