2021 IL App (1st) 182532-U

No. 1-18-2532

Order filed March 19, 2021

SIXTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 19826 |
| | ) | |
| JABRIL GARNER, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justice Connors and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction for first degree murder over his contentions that (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt, and (2) his sentence was excessive and unconstitutionally disparate to his codefendants' sentences.

¶ 2    Following a jury trial, defendant Jabril Garner was found guilty of first degree murder (720

ILCS 5/9-1(a)(1) (West 2010)) and sentenced to 35 years' imprisonment. On appeal, he argues (1)

the evidence was insufficient to sustain his conviction under an accountability theory; and (2) his

sentence was (a) excessive in light of his age, lack of involvement in the crime, and lack of criminal history and (b) unconstitutionally disparate to his codefendants' sentences. For the following reasons, we affirm.

¶ 3    The State charged defendant and codefendants Donnte Kindle and Antoine Ward with 12 counts premised on the beating death and robbery of Darius Chambers.[1] It went to trial against defendant on three counts of first degree murder, charging that defendant beat, stomped, and killed Chambers with his hands and feet intentionally (720 ILCS 5/9-1(a)(1) (West 2010)), knowing such acts created a strong probability of death or great bodily harm to Chambers (720 ILCS 5/9-1(a)(2) (West 2010)), and during the commission of a forcible felony, the robbery of Chambers (720 ILCS 5/9-1(a)(3) (West 2010)). Defendant and Kindle were tried in separate but simultaneous jury trials in 2018.

¶ 4    At trial, Rosa Mae Chambers Hardy, Chambers' mother, identified a photograph of Chambers. She testified he moved to Chicago in October 2011. Hardy was notified on November 1, 2011, that he had died.

¶ 5    Stephen Willis testified he was with Chambers on the night of October 29, 2011. They went to a Halloween party and later that night walked to a bus stop on 79th Street and Greenwood Avenue. While they were waiting, a man walked up to the bus stop from a nearby apartment building, followed shortly thereafter by another man who walked from Greenwood, and then two

---

[1] Kindle was found guilty of first degree murder and sentenced to 28 years' imprisonment. His appeal is currently pending in case number 1-19-0484. The parties inform this court that Ward pled guilty to first degree murder and was sentenced to 21 years' imprisonment. His 21-year sentence is reflected on the Illinois Department of Corrections' website. A third codefendant, Jonathan Primm, was charged separately and convicted by a jury of first degree murder and sentenced to 40 years' imprisonment. Primm's appeal is currently pending in case number 1-19-0588. Kindle, Ward, and Primm are not parties to this appeal.

more men, who came from a different direction on Greenwood. The men approached gradually over the course of 5 to 10 minutes. The second man asked to use Willis' cellphone, and Willis responded he did not have one. Willis was uneasy about the men's approach and attempted to make eye contact with Chambers. One of the four men "swung" on Chambers, and Willis ran toward a friend's house nearby. By the time he arrived at his friend's home, someone had notified authorities, so he returned to 79th and Greenwood. Chambers was on the ground with a sheet over him.

¶ 6     Willis identified defendant in court as the second man who approached him, the man who asked to use his cellphone. He previously identified defendant in a photographic array on October 30, 2011, and in a physical lineup the next day. Willis had also identified the first man who had approached him in a photo array on October 30, 2011, and in a physical lineup on November 2, 2011.[2] Willis did not get a good look at the other two men because he was trying to get Chambers' attention.

¶ 7     On cross-examination, Willis testified he ran as soon as the first man hit Chambers. No one caught up to him, and no one hit him while he was on Greenwood. Willis was 6'2 and the man who asked for his cellphone was approximately 5'9. Willis acknowledged that he initially described that man to police as being between 5'6 and 5'8. He testified the man who asked for his phone had light skin and denied telling police he had dark skin.

¶ 8     Zachary Morris testified he was driving near 79th and Greenwood late on October 29 into the early morning of October 30, 2011. While passing Greenwood, he saw a group of "at least four

_____

[2] Photographs of the photo array and lineup identified by Willis at trial demonstrate the first man who approached him was Antoine Ward.

men possibly more" at a bus stop "jumping on another individual on the ground." The men jumped on the individual's head with both feet as if "busting a cherry open," kicking his tailbone, trying to break his back. The men were also going through the individual's pockets and "beating him up at the same time." At some point, the men scattered. Most went south on Greenwood across the street, while one "crossed over" Morris's car, "running with the rest of the guys down Greenwood." Morris called the police and tried to give descriptions of the men but did not see their faces because they were covered.

¶ 9    Jalen Primm, who was 14 years old at the time of trial, testified he previously lived in Chicago in an apartment on Greenwood with his parents and siblings. Johnathan Primm was his cousin. Around Halloween in 2011 when he was seven years old, he observed "something happen" outside his apartment. At the time, some of his family members, including Primm, and "older people" who were friends with his brother Arnold Mitchell were present in the apartment. Jalen knew defendant and Ward but did not know Kindle.

¶ 10    That night, something woke Jalen up. He looked out the window and saw a man on the ground "getting beat up" at the bus stop across the street. The man was on the ground getting kicked and punched. Jalen did not remember how many people were beating the man up, but "all" the people he saw were kicking and punching him. Primm was one of the men. While the man was getting beat, "his" friend ran. Following the beating, someone came to Jalen's apartment but he could not recall who.

¶ 11    Jalen acknowledged that he previously testified when he was seven years old but did not recall specifically that he testified before a grand jury in November 2011. He did not recall previously identifying a photograph of Kindle or testifying that he looked out of the kitchen

window. He also did not recall that, after being asked what the men did after "they couldn't catch that man," responding that defendant, Kindle, Ward, and Primm returned to his house. Jalen acknowledged that he previously testified Primm was kicking and punching the man, and the four men returned to the house and started talking. He further acknowledged he was shown four photographs and signed his name on them but did not know whether he signed them because he identified the men in them. He had previously identified Primm in one of the photographs.

¶ 12     Jalen also acknowledged that he testified "here" in January 2018 but did not recall testifying that "four boys" were beating up the man and identifying them as defendant, Ward, Kindle, and Primm. Further, he did not recall testifying that Kindle and defendant were punching and kicking the man. Jalen previously testified he knew defendant and identified him in court. His sister Janilah was present when he saw the beating and he believed his mother was asleep. He went back to sleep after seeing the beating.

¶ 13     Jalen did not recall testifying that the four men were at his house prior to him going to sleep that day or that they returned after beating. He remembered viewing lineups but could not remember identifying anyone. Jalen then remembered viewing a lineup and identifying defendant. He identified Primm in a lineup and Ward in a photograph array but denied identifying Kindle. Jalen did not remember giving a recorded video statement to an assistant State's Attorney (ASA) on November 1, 2011.

¶ 14     On cross-examination, Jalen testified defendant was Mitchell's friend and he knew defendant for years. Jalen could not remember how long he lived on Greenwood and could not recall which window he looked out on the night in question. Jalen also could not recall details

regarding his own height, window coverings, the time he went to bed, or whether the men had hoodies on.

¶ 15    Jalen's mother, Shannon Primm, testified she had previously testified and "as a result," the State's Attorney's office assisted her with relocating outside of Illinois. The State's Attorney's office gave her money to move and made travel arrangements for her and her children, Jalen and Jamirah, to get to court. Other than relocating and travel expenses, she was not promised anything or threatened in exchange for her testimony.

¶ 16    In October 2011, Shannon lived on the 7900 block of Greenwood on the third level of the building with her then-husband Jeffrey Primm and her eight children. Their apartment had a front and back exit, and the living room window overlooked 79th Street. On the night in question, she was asleep and woke up when her daughter Tatanisha was talking to Jeffrey. Shannon looked out the window and saw a white sheet. She acknowledged that she previously testified in January 2018 that she learned from Tatanisha that a man was lying under the white sheet. Jeffrey had called the police. Shannon observed Primm and Kindle sitting on the couch when she woke up. She did not see anyone else in the house but had been sleeping so she was unaware if anyone came or went. The police "took" Primm and Kindle that night.

¶ 17    On November 2, 2011, Shannon found an identification card in her kitchen. She had never seen the person pictured in the identification, but later recognized him as the man who had been murdered. Upon finding the identification, Shannon called the police, who collected it.

¶ 18    Janilah Primm testified she was 13 years old at the time of trial. She lived in the Greenwood apartment with her parents, Shannon and Jeffrey, and her siblings in October 2011. On October 30, 2011, she observed a body near the bus stop. Primm, Ward, Kindle, and defendant were at the

Primm apartment prior to her seeing the body. Janilah identified defendant in court. She did not go bed that night. From her bedroom, located near the front entrance of the apartment, she overheard Primm say he "had a stain," which she understood meant "[l]ike a robbery." Janilah heard one of the men say in response, "let's go." However, she denied knowing which man had responded. Janilah then heard multiple footsteps going down the stairs and leaving the apartment. After "some time had passed," she heard "them running back through the house."

¶ 19    At some point, Janilah left her room and Primm, Kindle, defendant, and Ward were back in the apartment. Mitchell, her brother, came out of his bedroom when Janilah left her bedroom. When Janilah looked out the window, she saw a man on the ground by the bus stop. He was not moving. She did not recall seeing Jalen, but he was awake by that time. Janilah called her sister Tatanisha and brother Jabari, who were not home. They returned to the apartment and woke Shannon and Jeffrey, who called the police. Janilah overheard a conversation between defendant and Primm. Defendant said that Primm "killed a man outside," but she did not recall Primm's response.

¶ 20    Janilah acknowledged she previously testified before a grand jury in November 2011 and in another hearing in January 2018. She denied testifying before the grand jury that, after Primm said he had a stain, defendant responded "we out there then." Janilah denied giving anyone's names during her grand jury testimony. She did not recall testifying in January 2018 that she heard defendant say "come on, we gone" to Primm after he mentioned a stain. She identified photographs of Ward, Primm, defendant, and Kindle.

¶ 21    On cross-examination, Janilah testified she did not hear who said, "we gone, we're out." Following the beating, she told a detective that she heard Primm talk about a stain and someone said "we are going we are out there" but did not give a name.

¶ 22    Former ASA William Henry Hall IV testified he questioned Jalen before a grand jury in November 2011. Jalen was with his mother, Shannon. Hall published portions of Jalen's grand jury testimony. Jalen testified before the grand jury that he looked out of his kitchen window, and Primm, defendant, Ward, and Kindle returned to the Greenwood apartment after they "couldn't catch that man." Further, Jalen had identified a photograph of Kindle, who had come to his house. Jalen also identified photographs of Ward and defendant and signed his name on the photographs.

¶ 23    Hall also presented Janilah to the grand jury in November 2011 and published portions of her grand jury testimony. Janilah had testified that Primm said, "Yeah, come on" and defendant responded, "We out there then."

¶ 24    ASA Maria Augustus testified she was the ASA when Jalen and Janilah testified in January 2018. She published portions of Janilah's January 2018 testimony. Janilah testified that she heard Primm say he had a stain, and defendant responded, "come on we gone."

¶ 25    ASA Augustus also published portions of Jalen's January 2018 testimony. Jalen testified that four boys were beating a man. Jalen named defendant, Ward, Kindle, and Primm as the "four boys." Before Jalen went to sleep that night, all four men were at the Greenwood apartment. Jalen saw both Kindle and defendant kicking and punching the man. Following the beating, the four men returned to the Greenwood apartment. At some point, Jalen's father woke up and called the police.

¶ 26    ASA Kelly Grekstas testified Jalen, with Shannon present, gave a recorded interview on November 1, 2011. The video recording of the interview was published for the jury. Jalen tells

police he was looking out the window with some of his siblings on the night of the offense to see "if they was about to fight." There were two men Jalen did not know at the bus stop. Primm, Kindle, defendant, and Ward were at the Greenwood apartment and then left to go outside. Primm and Ward left through the front door, while defendant and Kindle left through the back door. The four men approached the two men at the bus stop. One of the men at the bus stop ran, while the other was beaten. Jalen says all four men were "stomping him and kicking him and punching him" as the man was on the ground. All four men chased the man who ran, but eventually returned to the Greenwood apartment when they were unable to catch him. They were talking, and Jalen went to sleep. Jalen later identified defendant in a lineup as one of the men punching the man at the bus stop. During the interview, Jalen identified photos of defendant, Kindle, Primm, and Ward and signed the pictures.

¶ 27    Arnold Mitchell testified he was subpoenaed and not testifying voluntarily. Defendant was his best friend, Primm was his cousin, Ward was a family friend, and he knew Kindle through defendant. He identified both defendant and Kindle in court. Mitchell was with Ward on October 29 into October 30, 2011. They planned to go to a party but instead returned to the Greenwood apartment. Defendant, Kindle, and Primm were there. Mitchell made food while the other men were in the living room. He heard Primm talking and subsequently went to bed. Later, Mitchell awoke and noticed the apartment lights were off. He went into the kitchen and saw Janilah looking out the window. He looked out and saw a body on the ground. Mitchell then saw Primm and Kindle entering the back door. He did not recall his sister Tatanisha and brother Jabari coming home. Mitchell went back to sleep and woke up again when the police arrived.

¶ 28    Mitchell acknowledged he testified before a grand jury in November 2011 that he saw Primm and Kindle running toward the apartment and "a man laid out." He testified at trial that he "never saw them running from the scene."

¶ 29    An evidence technician identified photographs of the scene. The photos showed Chambers' body on the sidewalk with his left pocket pulled out, broken eyeglasses near Chambers' arm, a black skullcap, an unused condom, and a receipt. The evidence technician recovered those items and inventoried them.

¶ 30    Now-retired Chicago police detective Earl Parks was assigned to investigate Chambers' death. He canvassed the scene and observed Chambers on his back. His hands were stretched out and he was bleeding from his nose and mouth. Parks learned Kindle and Primm, who were in the Greenwood apartment, had been detained and interviewed them. The police released Kindle and Primm that day because they did not have enough evidence to hold them.

¶ 31    Parks called Willis into the police station to view a physical lineup around 9 a.m. on October 30, 2011. Willis could not identify either Primm or Kindle and stated he could only identify the two who attacked him. Willis identified defendant and Ward in separate photo arrays. Parks then went to the Greenwood apartment to interview Mitchell, Jalen, and Janilah. Following their interviews, Parks put out an investigative alert for defendant and Kindle, who were then arrested.

¶ 32    On October 31, 2011, Jalen viewed two separate physical lineups with Shannon present. Jalen identified defendant in one lineup and Kindle in another. Jalen identified Primm and Ward in photo arrays and printed his name on the photos. On November 2, 2011, Jalen viewed a lineup and identified Ward. Willis also viewed a lineup and identified Ward that day. Parks later learned

Shannon found Chambers' identification hidden under a cabinet in her kitchen, which was recovered by an evidence technician.

¶ 33    After defendant was arrested, he was placed in an interview room with a recording device. Parks interviewed defendant in the room with the recording device. ASA Grekstas later interviewed defendant in the same room. Portions of the video recorded statements were published to the jury.

¶ 34    In the video with Parks, defendant acknowledges he heard Primm say repeatedly "let's go hit a stain" at the Greenwood apartment while he, Kindle, Ward, and Arnold were present. Primm, Ward, Kindle and defendant went to the bus stop together. Defendant told Ward he was going to leave because he did not "want to do it in the first place," but Ward said, "come on," and hit one of the men. Ward threw the first punch, and one of the men ran, so defendant chased him. Ward and Primm beat Chambers, while defendant chased Willis. Defendant denies participating in the beating and states he returned to the Greenwood apartment after chasing Willis. As he returned to the apartment, he saw Ward and Primm beating Chambers. Once back in the apartment, Ward stated he believed he fatally kicked Chambers when Chambers attempted to stand. Defendant states Primm took Chambers' identification from his back pocket.

¶ 35    In the recorded interview with ASA Gretkas, defendant states several times that he knew he, Primm, Kindle, and Ward were leaving the house to rob the men on the corner but that he did not want to participate. At the bus stop, Primm asked if one of the men at the bus stop had a phone on them. Defendant "guess[ed]" that was to "see if he had something on him." Defendant states he chased the man who ran, and Kindle ran once Ward hit the man who fell. Only Primm and Ward were hitting the man on the ground.

¶ 36 On cross-examination, Parks testified defendant was approximately 6 feet tall and was 18 years old at the time of the interview. Willis described the man who asked for his phone as having a dark complexion and being 5'6 or 5'7. When Janilah spoke with Parks about Primm saying he had a stain, Janilah did not say anyone responded verbally but "they" responded by following Primm down the stairs.

¶ 37 Dr. Ponni Arunkumar, a medical examiner who was qualified as an expert in the field of forensic pathology, reviewed Chambers' autopsy report and concluded his cause of death was subarachnoid hemorrhage due to blunt force injuries to his head from an assault. The manner of death was homicide. Dr. Arunkumar testified the autopsy revealed injuries to Chambers' forehead, face, chest, fingers on his left hand, and right knee. Chambers had "patterned abrasions" on his forehead, which occur when an object with a particular pattern strikes the body. Chambers suffered a "deep scalp hemorrhage" in his left temporal area caused by blunt force trauma, and bleeding in the brain at the base of the skull, which extended upwards around the side of the brain. Dr. Arunkumar identified various photos of Chambers' injuries. She did not conduct Chambers' autopsy.

¶ 38 The jury was instructed on first degree murder under the three theories (intentional, strong probability, and felony murder) and on the law of accountability. It was provided with general verdict forms of guilty and not guilty, with no distinction between the three theories. Following arguments, it found defendant guilty of first degree murder. The court denied defendant's motion for a new trial.

¶ 39 Defendant's presentence investigation report (PSI) revealed he had no prior criminal history, no gang affiliation, and a ninth-grade education. He had been suspended from elementary

school approximately 10 times for fighting. Defendant wanted to complete his GED while incarcerated and hoped to pursue a career in construction. He did not know his father and was raised by his grandmother and mother, whom he described as loving and "everything good." Defendant had five siblings with whom he had good relationships. His family was supportive. Although he described his childhood as "rough," he also stated his life was devoid of any abuse or neglect.

¶ 40　At defendant's sentencing hearing, Chambers' mother Rosa Mae Chambers Hardy testified and published a victim impact statement she prepared. Her statement revealed she had had to "bury" all three of her children, including Chambers. Hardy was close with Chambers and described her grief at losing him and having to relive his murder each year. She went to court to ensure defendant received "full punishment for taking an irreparable life." Hardy pointed out that, in the seven years since Chambers' murder, defendant had displayed no remorse and denied his guilt. She believed it would be "another blow" to Chambers' family if defendant was sentenced to anything less than the maximum.

¶ 41　In aggravation, the State argued that, based on the egregiousness of the crime, the minimum sentence was not warranted. It noted how Chambers was minding his business and was beaten, had his glasses broken and pockets turned out, and was left to die. The State acknowledged defendant had no criminal background but urged the court not to take defendant's actions lightly, given that the crime was completely unprovoked. Moreover, given defendant's age, deterrence was necessary because he would likely get out of prison.

¶ 42　In mitigation, defense counsel argued defendant was 18 years old at the time of the offense. According to defendant's version of events, he chased Willis but did not participate in beating

Chambers or go through his pockets. Defense counsel emphasized defendant's lack of criminal history and argued he had no problems in jail, where he had been since his arrest in 2011, and thus demonstrated "the possibility of rehabilitation." Counsel presented letters from defendant's cousins, aunts, and parents.[3] His father was present for sentencing, and defendant had family support at numerous court hearings.

¶ 43    The trial court sentenced defendant to 35 years' imprisonment on both the intentional murder (count I) and felony murder (count VII) counts, to be served concurrently. It merged the strong probability murder count (count IV) into the intentional murder count.

¶ 44    In imposing sentence, the court went through the enumerated statutory factors in aggravation and mitigation. It found it did not know whether the factor stating, "The defendant did not contemplate that his criminal conduct would cause or threaten serious physical harm to another," was applicable given the evidence suggesting "there was planning involved in overlooking the bus stop area where this crime occurred" and it appeared the men were waiting for a target of opportunity. The court stated there were two such targets at the bus stop and defendant "went down to commit a robbery," "participated in a physical foot chase with the possible victim," and was "actively involved in this incident." It found there was no provocation or grounds to excuse or justify defendant's conduct. The court acknowledged that, to some extent, the criminal conduct was inducted or facilitated by another individual, but "to take down two people in a robbery took four people" so defendant was "on board all the way with the codefendants."

---

[3] The letters referenced by defense counsel are not included in the record on appeal.

¶ 45    The court additionally acknowledged defendant had no criminal history and gave him the "benefit of the doubt" that his criminal conduct was the result of circumstances unlikely to occur. However, the court then stated it was unsure whether defendant's character showed he was unlikely to reoffend since he "participated in a brutal beating of the victim" and "attempted to have two victims in play here." Nevertheless, the court again gave defendant the "benefit of the doubt" that his lack of criminal history showed he was unlikely to commit another crime. The court found the remaining mitigating factors were inapplicable.

¶ 46    The court then went on to address the statutory factors in aggravation, finding that defendant's conduct caused serious harm. It stated the offense was "a two or even three stage event," involving preplanning by waiting for a target, then pursuing one target and then another target. The court found defendant and the other men "had enough manpower" to simply rob Chambers and run away, but "[i]nstead they beat the guy to death." Considering whether defendant was trying to receive compensation for committing the offense, the court found this factor applied given the evidence that proceeds were found in the Greenwood apartment and Chambers' pockets were turned out, indicating "whatever he had in there was taken." Finally, the court found the sentence was necessary to deter others from committing the crime.

¶ 47    The court stated it considered that, at age 18, defendant was an adult but that there was "analysis in modern times about the development of the brain and is it fully developed until you're in your 20s." While the court questioned whether that had been "established as a general rule in all cases," it stated the "appellate court has always discussed sentences that could be construed as the equivalent of a natural life sentence." Mindful of that consideration, it stated the maximum

sentence was not appropriate because defendant was a "youthful offender." However, it also found the minimum sentence was not warranted.

¶ 48    Defendant subsequently filed a motion to reconsider sentence, which the trial court denied.

¶ 49    On appeal, defendant first contends the State failed to prove beyond a reasonable doubt that he was accountable for Chambers' death because the evidence showed he fled the scene after the first punch was thrown and did not participate in beating Chambers.

¶ 50    On a challenge to the sufficiency of the evidence, we inquire " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Davison,* 233 Ill. 2d 30, 43 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In so doing, we draw all reasonable inferences in favor of the State (*Davison*, 233 Ill. 2d at 43), and we do not retry the defendant (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The State must prove each element of an offense beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). We will not overturn a criminal conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Givens,* 237 Ill. 2d 311, 334 (2010).

¶ 51    Defendant was found guilty of first degree murder for intentionally and knowingly beating, stomping, and killing Chambers with his hands and feet pursuant to section 9-1(a)(1) of the Criminal Code (720 ILCS 5/9-1(a)(1) West 2010)).[4]

---

[4] Defendant was charged with three forms of a single murder (intentional, strong probability, and felony murder), and the jury found him guilty on a general verdict form. The net effect of the jury's general verdict of guilty of first degree murder is that defendant "is guilty as charged in each count and there is a presumption that the jury found that the defendant committed the most serious of the crimes alleged, which is intentional murder." *People v. Davis*, 233 Ill. 2d 244, 263 (2009). Thus, sentence should

¶ 52    Here, the evidence was sufficient to prove defendant guilty of murdering Chambers. Jalen's prior testimony before the grand jury showed defendant was one of the participants in Chambers' robbery and beating. Jalen knew defendant, saw him at the Greenwood apartment prior to the beating, and watched from the window as defendant, Primm, Ward, and Kindle approached Chambers and Willis at the bus stop. Shortly after the crime, in his statements at the police station and under oath before the grand jury, he specifically identified defendant as punching and kicking Chambers. He made the same identification at the January 2018 hearing. The medical examiner confirmed that Chambers died as a result of a subarachnoid hemorrhage due to blunt force injuries to his head from an assault.  Moreover, as Morris drove by in his car, he observed "at least four people" beating Chambers, thus corroborating Jalen's testimony identifying four men, including defendant, as beating Chambers. Janilah overheard Primm talking about a potential robbery, and her prior testimony, admitted substantively, showed she testified twice that she overheard defendant make a statement of assent in response to Primm's robbery statement before leaving the Greenwood apartment with Primm.

¶ 53    Although defendant argues Jalen disavowed his prior testimony and statement to police, those statements were properly admitted substantively at trial. See 725 ILCS 5/115-10.1 (West 2010) (allowing admissibility of prior inconsistent statements where the witness is subject to cross-examination and the statement was made under oath or describes an event of which the witness had personal knowledge and the statement was recorded)). Additionally, the jury heard Jalen testify he could not remember various aspects of the incident and did not recall previously

_____

be imposed, and the conviction entered, on only the intentional murder count. See *People v. Cardona*, 158 Ill. 2d 403, 411-12 (1994). Accordingly, although the trial court imposed concurrent 35-year sentences on both the intentional and felony murder counts, we consider only the sentence on the intentional murder count.

testifying to certain details. It was for the jury to judge his credibility. *Siguenza-Brito*, 235 Ill. 2d at 228 (It is within the province of the trier of fact "to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence."). In sum, the evidence shows that defendant actually participated in the beating that killed Chambers.

¶ 54    Further, even without Jalen's testimony that he saw defendant beating Chambers, the evidence taken in the light most favorable to the State was ample to prove defendant guilty of first degree murder under an accountability theory. A person is legally accountable for the criminal conduct of another if "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2010). "[I]t is well settled that, under the Illinois accountability statute, the State may prove a defendant's intent to promote or facilitate an offense by showing either (1) that the defendant shared the criminal intent of the principal, or (2) that there was a common criminal design." (Emphasis omitted.) *Fernandez,* 2014 IL 115527, ¶ 21.

¶ 55    When two or more people engage in a common criminal design or agreement, "any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts." 720 ILCS 5/5-2(c) (West 2010). While "[m]ere presence at the scene of a crime does not render a person accountable for an offense, a person's presence at the scene of a crime *** may be considered with other circumstances by the trier of fact when determining accountability." *Id.* "Evidence that a defendant voluntarily attached himself to a group bent on

illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *In re W.C.,* 167 Ill. 2d 307, 338 (1995). Moreover, in determining accountability, a trier of fact may consider, among other things, a defendant's presence at the scene without disapproval, his flight from the scene, his failure to report the crime, and his close affiliation with codefendants following the crime. *People v. Gabriel*, 398 Ill. App. 3d 332, 345 (2010) (citing *People v. Taylor*, 164 Ill. 2d 131, 141 (1995)).

¶ 56 The evidence here proved beyond a reasonable doubt that defendant engaged in a common design with Primm, Kindle, and Ward to rob Chambers and was accountable for the conduct which resulted in Chambers' death. Defendant's statement to ASA Grekstas while he was in police custody showed that he was well aware Primm wanted to rob someone as Primm had stated that he wanted to "hit a stain." Defendant acknowledged he knew Primm intended that he, Kindle, and Ward participate in the robbery, and that, as he walked down the stairs to go outside that night with the three other men, he knew he and the others were going to rob the men at the bus stop. Although defendant told Grekstas he did not want to participate, this evidence shows he was at the scene without disapproval and voluntarily attached himself to the group knowing the purpose was to rob Willis and Chambers.

¶ 57 Moreover, Willis's testimony showed defendant furthered the acts of the group by approaching Willis and Chambers and asking to use Willis' cellphone, demonstrating more than "mere presence" at the scene. Although defendant attributed that question to Primm in his recorded statement, he acknowledged the question was intended to determine whether Willis "had something on him." Then, when Willis ran to escape, defendant chased after him and took a swing at him.

¶ 58    Additionally, defendant continued to associate with the rest of the group following the crime, returning with the other men to the Greenwood apartment following the beating. At the Greenwood apartment, the men discussed the crime, which defendant acknowledged in his statement when he stated Ward believed he delivered the fatal kick. Defendant did not call the police to report the crime, and he left the Greenwood apartment prior to Jeffrey Primm calling the police. Thus, the evidence shows defendant voluntarily and knowingly attached himself to a group bent on an illegal act, the robbery of Chambers and Willis, participated in that robbery, and is responsible for all the consequences of the group's further acts—the murder of Chambers.

¶ 59    Defendant argues the evidence was insufficient to show he was accountable because he did not participate in the attack on Chambers. As evidence of this, he points to his recorded statement in which he asserted he did not beat Chambers and instead chased Willis before returning to the Greenwood apartment. However, the jury was presented with defendant's statement and theory of the defense, and still found him guilty. Again, it was for the jury to weigh the evidence provided by the witnesses against defendant's statement. *Siguenza-Brito*, 235 Ill. 2d at 228. "A trier of fact is not required to disregard the inferences that normally flow from the evidence or to seek out all possible explanations consistent with a defendant's innocence and elevate them to reasonable doubt." *People v. Murphy*, 2017 IL App (1st) 142092, ¶ 11.

¶ 60    Further, even taking defendant's statement that he did not participate in the beating as true, the evidence showed he agreed to the robbery, went outside to commit the robbery, initiated the robbery by asking Willis for his phone, chased after and took a swing at escaping victim/witness Willis, and then returned to the apartment where he continued to associate with Primm, Kindle, and Ward. Thus, as he was present at the scene without disapproval, voluntarily attached himself

to the group knowing they were going to commit a robbery, furthered the acts of the group, continued to associate with the others after the crime, and failed to call the police, defendant was "equally responsible for the consequences of those further acts." 720 ILCS 5/5-2(c) (West 2010).

¶ 61 Defendant next argues that his sentence (1) is excessive in light of his age, his limited involvement in the offense, and his lack of criminal history; and (2) is unconstitutionally disparate to Ward's and Kindle's sentences.

¶ 62 We accord great deference to a trial court's sentence and will not reverse it absent an abuse of discretion. *People v. Butler*, 2013 IL App (1st) 120923, ¶ 30 (citing *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000)). "A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." *People v. Jackson,* 375 Ill. App. 3d 796, 800 (2007). In determining an appropriate sentence, the trial court considers such factors as "a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment." *People v. Hernandez*, 319 Ill. App. 3d 520, 529 (2001).

¶ 63 Absent some affirmative indication to the contrary, other than the sentence itself, we presume the trial court considered all mitigating evidence before it. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55. Because the trial court, having observed the proceedings, is in the best position to weigh the relevant sentencing factors (*People v. Arze*, 2016 IL App (1st) 131959, ¶ 121), we do not substitute our judgment for that of the trial court simply because we would have balanced the appropriate sentencing factors differently (*People v. Alexander*, 239 Ill. 2d 205, 213 (2010)).

¶ 64 Defendant was sentenced to 35 years' imprisonment for first degree murder, which falls within the statutory sentencing range of 20 to 60 years. See 730 ILCS 5/5-4.5-20(a) (West 2018)

(sentencing range for first degree murder)). Thus, we presume his sentence was proper, absent some indication otherwise. See *People v. Burton,* 2015 IL App (1st) 131600, ¶ 36.

¶ 65    Defendant argues his sentence was excessive as it does not reflect adequate consideration of his youth, minimal role in the offense, and lack of criminal background. He notes he was 18 years old at the time of the offense, "an age marked by an immature level of brain development that made him categorically different from older adult offenders." He also points out he had no prior criminal history despite growing up in an unstable home environment and possesses strong rehabilitation potential. However, defendant points to nothing in the record affirmatively demonstrating that the sentencing court did not consider the relevant sentencing factors. See *Id.* ¶ 38.

¶ 66    In fact, the record shows the trial court explicitly considered the relevant statutory factors in aggravation and mitigation, reciting them in detail. See 730 ILCS 5/5-5-3.1 (West 2018) (factors in mitigation); 730 ILCS 5/5-5-3.2 (factors in aggravation). The court noted, *inter alia*, there was evidence the robbery was planned and it appeared the men were waiting for a target. It further stated there was no provocation or substantial grounds which would justify or excuse defendant's behavior. However, the court gave defendant "the benefit of the doubt" on other mitigating factors, noting the offense was likely facilitated by someone else, the circumstances were not likely to recur given defendant's lack of criminal history, and defendant had the potential for rehabilitation.

¶ 67    The court explicitly considered that defendant was only 18 years old at the time of the offense. Its note that, "[t]here's been analysis in modern times about the development of the brain and is it fully developed until you're in your 20s," underscores its consideration of defendant's youth as a mitigating factor. In fact, given defendant was a "youthful offender," the court found

the maximum sentence not appropriate. However, weighing against those mitigating factors was defendant's participation in the robbery, that he was "on board all the way with the other codefendants," and the crime's "brutal" nature, and the court found the minimum sentence unwarranted. Thus, the record shows the court properly weighed the mitigating factors.

¶ 68    Defendant argues his "rough childhood" warrants a more lenient sentence. However, aside from a line in his PSI about his rough childhood, his PSI shows defendant was raised by his mother and grandmother, had supportive siblings, and his life was "void of any abuse or neglect." Defendant described his mother as "loving and 'everything good' " and both his mother and father were present on multiple court dates. Although the court did not state on the record it considered defendant's PSI, the trial court presumed to consider all mitigating evidence before it. *Jones*, 2014 IL App (1st) 120927, ¶ 55.

¶ 69    Defendant's characterization of his "limited involvement" in the offense is rebutted by evidence presented at trial, which showed he participated in Chambers' beating. Moreover, "[t]he most important sentencing factor is the seriousness of the offense, and the court need not give greater weight to rehabilitation or mitigating factors than to the severity of the offense." *People v. Contursi*, 2019 IL App (1st) 162894, ¶ 24. The seriousness of the offense in this case cannot be understated. As the trial court noted, there was planning involved in the offense, and it was "a two or even three stage event," leading to the unprovoked and brutal beating of Chambers. As the court pointed out, the men could have robbed Chambers and ran away, but "[i]nstead they beat the guy to death." Under these circumstances, we do not find that the 35-year sentence was " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Alexander*, 239 Ill. 2d at 212 (quoting *Stacey*, 193 Ill. 2d at 210)). Given the court's

explicit consideration of the statutory factors in mitigation, defendant's age, the seriousness of the offense, and defendant's participation therein, the sentence did not constitute an abuse of discretion.

¶ 70 We are similarly unpersuaded by defendant's claim that his sentence is unconstitutionally disparate to Kindle's 28-year sentence and Ward's 21-year sentence. Generally, an arbitrary and unreasonable disparity between the sentences of similarly situated codefendants is impermissible. *People v. Caballero,* 179 Ill. 2d 205, 216 (1997). Our supreme court has previously held that fundamental fairness requires that "similarly situated" codefendants, who were involved in the same crime, should not "receive grossly disparate sentences." *People v. Fern*, 189 Ill. 2d 48, 58 (1999); see also U.S. Const., amend. XIV (due process clause); Ill. Const. 1970, art. I, §§ 2, 11 (due process and proportionate penalties clauses). However, a disparity in sentences, by itself, does not establish a violation of fundamental fairness. *Caballero*, 179 Ill. 2d at 216.

¶ 71 "An 'improper sentence disparity' may occur when 'equally culpable defendants with similar backgrounds are given substantially different sentences.' " *People v. Guerrero*, 2020 IL App (1st) 172156, ¶ 53 (quoting *People v. Ramos*, 353 Ill. App. 3d 133, 139 (2004)). To prevail on a claim of disparate sentencing, a defendant bears the burden of demonstrating that he and his codefendants were all (1) equally culpable and (2) "similarly situated with respect to background, prior criminal history, and potential for rehabilitation." *Ramos*, 353 Ill. App. 3d at 139; *People v. Curry*, 296 Ill. App. 3d 559, 569 (1998).

¶ 72 With respect to Ward, he pled guilty and received a 21-year sentence for his role in Chambers' death. By contrast, defendant was sentenced to 35 years following a jury trial. "A sentence imposed on a codefendant who pleaded guilty as part of a plea agreement does not

provide a valid basis of comparison to a sentence entered after a trial." *Id.* at 217. It is proper to grant dispositional concessions to defendants who plead guilty since the public interest in the effective administration of criminal justice is served. *Id.* at 218. Given Ward's guilty plea, we reject defendant's contention that the sentences are impermissibly disparate. See *People v. Scott*, 2012 IL App (4th) 100304, ¶¶ 26-27, 29.

¶ 73    Likewise, we do not find defendant's 35-year sentence was unconstitutionally disparate to Kindle's 28-year sentence. Defendant filed a motion in this court to direct the clerk of the circuit court to supplement his record on appeal with codefendant Kindle's presentence investigation report (PSI) and sentencing transcript. We allowed his motion. See *People v. James*, 2017 IL App (1st) 143391, ¶ 162 (in a disparate sentencing claim, a reviewing court may take judicial notice of codefendants' appeals and sentences); see *People v. Jimerson*, 404 Ill. App. 3d 621, 634 (2010) (a reviewing court may take judicial notice of codefendant's related appeal).

¶ 74    Defendant and Kindle had similar backgrounds. Kindle's sentencing transcript shows he had a pending case, but the court noted he also had no other criminal background. As at defendant's sentencing, Chambers' mother read her victim impact statement into the record.

¶ 75    However, the evidence at the simultaneous trial showed defendant and Kindle were not equally culpable. Janilah's prior testimony revealed defendant gave a statement of assent when Primm proposed robbing someone. Although all four men went outside with the purpose of robbing Willis and Chambers, defendant was identified by Willis as the offender who initiated the robbery when he approached Willis and asked for his cellphone. When defendant's conduct tipped Willis off that something was wrong, Willis ran, defendant chased him and swung at him and

defendant then joined in beating Chambers to death. After the men returned to the apartment and Jeffrey Primm called the police, defendant left the apartment prior to the police arriving.

¶ 76    In contrast, the evidence at Kindle's trial did not show Kindle initiated the robbery by asking victim Willis for his phone. Nor did he chase after the escaping Willis. While Jalen also identified Kindle as participating in the beating, Kindle remained in the Greenwood apartment afterward and spoke with police, who arrested him. Thus, the evidence shows Kindle was less culpable than defendant. See *People v. James*, 2017 IL App (1st) 143391, ¶ 161 (finding the defendant was less culpable than his codefendant who received a lesser sentence but upholding the defendant's higher sentence in part because the defendant facilitated the crime). Thus, we find defendant's sentence was proper.

¶ 77    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 78    Affirmed.